2020 IL App (1st) 162638-U

No. 1-16-2638

September 28, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 10 CR 21516 |
| | ) | 12 CR 5787 |
| ANTONIO COOKBAY, aka ANTONIO COOKBEY, aka | ) | |
| ANTONIO SMITH, aka MONTELL WOODS, | ) | Honorable |
| | ) | Steven J. Goebel, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE WALKER delivered the judgment of the court.
Justices Pierce and Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm defendant's convictions for home invasion, aggravated battery, and aggravated kidnapping over his contention that the evidence was insufficient to prove him guilty beyond a reasonable doubt. His convictions for home invasion and aggravated battery do not violate the one-act, one-crime doctrine.

¶ 2   Following a 2015 bench trial on two joined but separate cases, defendant Antonio Cookbay, aka Antonio Cookbey, aka Antonio Smith, aka Montell Woods, was convicted of home invasion (720 ILCS 5/12-11(a)(4) (West 2010) (recodified at 720 ILCS 5/19-6(a)(4) (eff. Jan. 1, 2013)))

and aggravated battery (720 ILCS 5/12-4.2(a)(1) (West 2010) (recodified at 720 ILCS 5/12-3.05(e)(1) (eff. July 1, 2011))) in case number 10 CR 21516 and sentenced to concurrent terms of 50 and 30 years' imprisonment. He was also convicted of aggravated kidnapping (720 ILCS 5/10-2(a)(6) (West 2010)) in case number 12 CR 5787 and sentenced to 45 years' imprisonment, to be served concurrently with the sentences imposed in case number 10 CR 21516. On appeal, defendant argues (1) the evidence was insufficient to convict him of home invasion, aggravated battery, and aggravated kidnapping; and (2) his convictions for home invasion and aggravated battery violate the one-act, one-crime doctrine. For the following reasons, we affirm.

¶ 3                               **BACKGROUND**

¶ 4     Defendant was charged with 34 counts in case number 12 CR 5787 for an incident on November 23, 2010, in which he allegedly kidnapped and battered his former girlfriend, Tasha Wilson. The State proceeded to trial on four counts of aggravated kidnapping, two counts of heinous battery, two counts of aggravated domestic battery, and one count of aggravated battery. Defendant was charged with 20 counts in case number 10 CR 21516 based on an incident that occurred on November 24, 2010, where defendant allegedly entered Wilson's family's home and shot her brother Charles Wilson, Jr. in the stomach. The State proceeded to trial on two counts of attempted murder, one count of aggravated kidnapping, four counts of home invasion, and one count of aggravated battery with use of a firearm. The cases were joined for trial.

¶ 5     At trial, Tasha Wilson testified that she previously dated defendant, whom she identified in court.[1] On November 23, 2010, around 3 p.m., she was at her mother's home sitting on the porch

_____

[1] Wilson is also referred to as Tasha Torres throughout the record. For purposes of consistency, we refer to her as Tasha Wilson.

with her brothers, Nathaniel Roberts and Charles Jr. Defendant showed up at the house and forced Wilson to leave with him. He whispered in her ear, "[Y]ou going to come walk off the porch with me and you are going to walk with me." Defendant had a gun in his hand, which was hidden by his sleeve, and threatened to shoot Wilson's brother if she did not comply. Wilson walked with defendant to his attic apartment near 55th Street and South Marshfield Avenue.

¶ 6    Once inside the apartment, defendant asked for Wilson's phone and Link card and said she "messed up for leaving" and would "pay for what [she] did." When Wilson was unable to produce her Link card, defendant searched her and found a letter from her "child's father," Albert Cathion. After reading the letter, defendant grabbed Wilson, threw her against the wall, and used his closed fist to hit her in the mouth. Defendant broke her tooth and split her lip. Wilson showed the court her tooth that was still broken, which was located on the right side of her mouth. Defendant thereafter screamed at Wilson and hit her in the head with his pistol, causing her to bleed. Wilson showed the court a scar in the center of her forehead below her hairline. Defendant continued to hit Wilson and ask her to explain why she had the letter from Cathion. Wilson repeatedly told him that Cathion was her child's father, but defendant accused her of lying.

¶ 7    At one point, defendant instructed Wilson to take off her clothes, he then tied her hands and feet with a shoestring. Defendant heated a wire hanger with a lighter and used it to burn Wilson's feet, legs, back, and the front of her thighs. He also used the lighter to burn her. Defendant poured bleach on the burns and instructed Wilson to get into the shower. After she got out of the shower, defendant forced her to drink a cup of bleach. Subsequently, defendant threatened to disfigure Wilson's face, tie her up and "take [her] outside and bring a lot of boys in there to have

sex with [her]." Eventually, defendant fell asleep around 9 p.m. with Wilson lying beside him as he slept.

¶ 8     Wilson initially testified she left the apartment on November 23, 2010, and she went to the home of her brother, J. Wilson. She later testified that she left the defendant's apartment at approximately 4 a.m. on November 24, 2010, and went to the home of her friend, James Thomas. She told Thomas what happened and showed her injuries. Thomas took Wilson to two different police stations to file a report, but police did not take a report. After leaving the second police station, Thomas drove Wilson to the home of her brother, J. Wilson. On December 1, 2010, Wilson went to the hospital.

¶ 9     Wilson identified photographs of the burns on her feet, inner thigh, legs, and back from when defendant burned her with the wire hanger, which were later admitted into evidence.[2]

¶ 10    On cross-examination, Wilson acknowledged that she had a prior conviction for burglary from 2007. She started seeing defendant in 2008 and had gotten pregnant three months prior to meeting him. Wilson initially testified that she dated defendant for three months in 2008. When defendant approached her on November 23, 2010, it had been over two years since Wilson had dated him. She testified she was pregnant on November 23, 2010, but later testified she did not get pregnant again after her 2008 pregnancy.

¶ 11    On November 23, 2010, Wilson was at her mother's house with Charles Jr., Roberts, and her mother. When defendant arrived, he spoke with her mother and brothers for a few minutes before telling her to leave with him. Defendant whispered in her ear and said if she did not leave with him, he would stab her mother and shoot her brothers. A woman, the woman's daughter, and

---

[2] These photographs are not included in the record on appeal.

the daughter's two children were also at defendant's apartment on the day in question and heard defendant torturing Wilson. Wilson did not ask for help at the time because "[t]hey knew [she] needed help." When Wilson left defendant's apartment, she flagged down a car, which took her to Thomas' house. She went to the hospital to have her wounds treated "[l]ike a day after" she left defendant's apartment.

¶ 12    On December 1, 2010, when Wilson spoke to detectives she told them that on November 23, 2010, defendant said he was going to let people rape her and then walked her outside to 55th Street and Wolcott Avenue and asked people at that location "what do you do to a person that deceives you?" She initially acknowledged telling police that the people at that location tried to help her but then denied reporting that anyone tried to help her.

¶ 13    On February 21, 2012, Wilson gave a statement at the police station. She acknowledged that, in her statement, she said she met defendant on May 19, 2010, and that she started having sexual intercourse with defendant in July 2010. She acknowledged that, at trial, she testified she dated defendant for three months in 2008, explaining, "I don't remember half this stuff." She also stated she had stopped "seeing" defendant in 2010 "when he did all that to me."

¶ 14    Wilson acknowledged she testified at a preliminary hearing in 2012 that she was pregnant on November 23, 2010, and defendant made her drink bleach to "kill the baby." Wilson was worried about drinking bleach while pregnant but did not go to the hospital after she left defendant's apartment. Although Wilson testified that she drank bleach after defendant instructed her to do so, she recalled testifying at the preliminary hearing that she said "no" when he told her to drink the bleach. She testified that defendant broke her side teeth, she but recalled testifying at the preliminary hearing that he broke her front teeth. Wilson also testified that when she left

defendant's apartment, she flagged down a car, but recalled testifying at the preliminary hearing that when she left defendant's apartment she ran to her friend's house.

¶ 15    James Thomas testified he had known Wilson for approximately 10 years. On November 24, 2010, around 4 a.m., Wilson came to his house. She looked as if someone "had beaten her up, and she looked really lame," and could "hardly walk." When Thomas asked what had happened to her, Wilson cried and said her "man friend" tied her up in an attic, and she "had been up there for quite a while." Wilson's face was "brutalized," and she had wounds on her "thighs and stuff, like it was burnt." When she took her shoes off, her feet were "kind of raw" and "the skin was like messing up on the foot and it was like swollen." Thomas then drove Wilson to a police station where Wilson informed the officer of what had occurred, but the officer did not take a report. The officer told Wilson and Thomas that they had to go back to the scene of the crime and have officers meet them there "in order for them to have anything done about the situation." Thomas told the officer they would not go back to the scene and then drove to a second police station, where the police also refused to take a report. Thomas then drove Wilson to her friend's house. He suggested taking Wilson to the hospital, but she did not want to go and was "really upset and everything."

¶ 16    On cross-examination, Thomas testified that when Wilson arrived at his home, she "could have" told him that she had flagged down a car, but he could not recall because it had happened five years prior. He did not call 911 after she arrived. When they arrived at the first police station, Wilson had a hard time walking in because she was "limping pretty bad." The police did not offer to take Wilson to the hospital and did not photograph her injuries. At the second police station, the officer "threw" him out of the station. However, officers came to his house within a week and asked about the incident with Wilson.

¶ 17    Charles Wilson, Jr. testified that on November 23, 2010, he was on his mother's porch with Wilson, Roberts, and his mother. At some point, defendant, whom he identified in court, arrived at Charles Jr.'s mother's house. Charles Jr. left the porch but did not see Wilson leave. On November 24, 2010, he was in the shower around 8 a.m. in his house on the 5500 block of South Wolcott Avenue. His father, Charles Wilson, Sr. and Roberts also lived at that residence. While Charles Jr. was in the shower, he heard a "rumbling" that shook the bathroom. He exited the shower and saw defendant "beating" on Fannie Hallom, the healthcare provider for Charles Sr. Defendant was holding a gun in his left hand and beating Hallom with his right hand. Charles Jr. could see Hallom's feet "hanging" out of the pantry.

¶ 18    Defendant pointed a gun at Charles Jr., who was standing in the bathroom doorway, and asked about Wilson's whereabouts. Charles Jr. responded that she did not live there. When Charles Jr., went to check on his wheelchair-bound father, Charles Sr., defendant followed. Defendant then pointed the gun at the back of Charles Jr.'s head. The gun was a silver "short revolver."

¶ 19    After attending to his father, Charles Jr. looked up and saw defendant with the gun pointed at him. He heard defendant pull the trigger. The gun "clicked" but did not fire, so Charles Jr. ran toward the bathroom. Defendant followed him and fired the gun. The bullet hit Charles Jr.'s right arm and then hit the right side of his stomach, where it was still lodged at the time of trial. Following the shooting, Roberts was in the back room of the house. Defendant, still holding the gun, turned to Roberts and "told him to come the f*** on." Roberts complied and defendant pointed the gun at him as the two walked out of the house. Charles Jr. went to the hospital for his gunshot wound. He showed the court the scars on his arm and stomach from the bullet.

¶ 20    On cross-examination, Charles Jr. testified that, on November 23, 2010, he walked up to the porch where his mother, defendant, Wilson, and Roberts were sitting. Wilson and defendant were sitting "boyfriend/girlfriend style." Charles Jr. stayed for 10 minutes and was the first to leave. Wilson never told Charles Jr. that defendant had threatened her, and Charles Jr. did not observe defendant engaging in threatening behavior.

¶ 21    As to the incident on November 24, 2010, Charles Jr. denied telling a police officer that when he exited the shower, he saw Roberts engaged in an altercation with Wilson's "boyfriend." He testified that defendant shot him before Roberts entered the room, and did not recall testifying at the preliminary hearing that defendant told Roberts to "come on" and then shot him or that he heard voices while he was in the shower. The parties stipulated that the preliminary hearing transcript reflected he testified to both of those statements.

¶ 22    Charles Jr. testified that defendant pointed the gun at him the entire time and denied that he testified at the preliminary hearing that defendant put the gun down at one point. The parties stipulated that he previously testified defendant put his arm down at one point. They additionally stipulated that Charles Jr. testified at the preliminary hearing that defendant was standing behind him near his bedroom when he first attempted to shoot the gun, and it did not fire.

¶ 23    Fannie Hallom testified that she worked in "home care," assisting senior citizens. In the morning on November 24, 2010, she was at Charles Sr.'s home in the kitchen talking to Roberts. While Hallom was in the kitchen, a "young man," who had face tattoos and whose name she did not know, entered the house. When asked if she saw the man in court, Hallom stated, "He didn't have all the facial hair."

¶ 24   The man approached the kitchen with a gun and asked Roberts, "where is that 'B'," referring to Wilson. The man then looked at Hallom, called her a "B" and hit her with his hand while his other hand still held the gun. Hallom grabbed the man's hands, who then said to Roberts, "tell this B-I-T-C-H to let me go before I shoot her in the face." Roberts told the man that Hallom had "nothing to do with this." At that point, Hallom was able to run and hide in a closet and call 911. While in the closet, Hallom heard gunshots, but she did not know how many she heard. Hallom had seen the man with the gun approximately one week prior with Wilson.

¶ 25   On cross-examination, Hallom denied that the man hit her more than once. She did not hear any yelling or words while she hid in the closet but heard "at least two" gunshots. She did not see the man or Roberts leave.

¶ 26   Nathaniel Roberts testified that on November 24, 2010, around 8 a.m., he was at Charles Sr.'s house in the kitchen with Hallom. Charles Jr. was in the shower and Charles Sr. was in the front room. While Roberts was in the kitchen, defendant, whom he identified in court, entered. Defendant asked Roberts whether he had seen Wilson, and Roberts told him he had not. Defendant appeared "real jittery" and was looking around. Defendant started pushing Hallom and "slightly hit her" with the palm of his hand while holding a gun in his other hand. Hallom then stood behind Roberts. Defendant "flashed" the gun and told Roberts to move out of the way. Defendant repeatedly asked about Wilson, and Hallom eventually ran away. Defendant instructed Roberts to put his clothes on so Roberts ran to his room, which was behind the kitchen. As he was getting dressed, he heard "a lot of commotion." He heard defendant arguing with Charles Jr., although he could not hear what they were saying, and subsequently, a single gunshot.

¶ 27    Upon hearing the gunshot, Roberts left his room, and defendant told him to "come on." Roberts left the house because defendant was pointing the gun at him. Defendant took Roberts to an attic apartment building where he again asked Roberts about Wilson's whereabouts. To cooperate with defendant, Roberts called Charles Sr. and informed him that if they did not find Wilson, defendant would shoot Roberts. Defendant was "in and out" of the apartment for the entire day, but Roberts remained in the apartment out of fear of being shot. Around 5 p.m., police arrived and removed him from the apartment.

¶ 28    On cross-examination, Roberts acknowledged that he did not witness Charles Jr. get shot. He recalled telling a detective that defendant told him to "come on," then said "f*** this" and shot Charles Jr. Although he testified on direct examination that defendant took him directly to the attic apartment, he acknowledged he had told a detective that he went to a gas station where defendant hit an unknown man. He did not recall telling the detective that after leaving the gas station, he went with defendant to ask "others about money" and then to defendant's friend's house. Roberts told a detective that defendant had threatened him and said he "would bring harm to the entire family." He did not call the police when defendant left the apartment because he did not personally have a phone.

¶ 29    Roberts acknowledged that he testified at the preliminary hearing on December 1, 2010. He did not see how defendant entered Charles Sr.'s house. He did not recall previously testifying that defendant asked only once where Wilson was. Roberts described the gun as a "small revolver" but acknowledged that he previously testified it was a "little pistol." Roberts denied that he testified to seeing defendant shoot Charles Jr.

¶ 30     Roberts acknowledged he testified at the preliminary hearing that, when he left the house with defendant, they went to a store so defendant could get cigarettes. At trial, however, he testified that they first went to the apartment and then left to get cigarettes. He did not try to run or call out for help while they walked or when he was outside while defendant bought cigarettes. At the preliminary hearing, Roberts testified that defendant had not pointed the gun at him while they were walking but clarified at trial that defendant was carrying the gun "the whole time." Roberts last saw defendant with the gun when they were at defendant's apartment. He did not recall testifying at the preliminary hearing that the last time he saw defendant with the gun was at Charles Sr.'s house.

¶ 31     Roberts stated that after returning to defendant's apartment, they stayed for about 30 minutes. Defendant did not threaten Roberts at that time but still had the gun. Roberts stayed at defendant's apartment until the police arrived around 5 p.m. He did not recall testifying at the preliminary hearing that, after arriving at defendant's apartment, they stayed for "about five or ten minutes" and then left again to walk the block a few times before returning to the apartment. He later acknowledged testifying at the preliminary hearing that he and defendant "stayed like off and on from like two to four or five minutes and then we look [*sic*] out for police and stuff." Roberts did not know whether he testified at the preliminary hearing that he left the apartment "about three times" with defendant.

¶ 32     Roberts had lived with Charles Sr. since 2009. Roberts denied that any of Wilson's boyfriends were present in the house on the day in question. He also denied that he saw Wilson or was on her mother's porch the day before the incident. Roberts did not know that Wilson accused

defendant of injuring her the day prior. As far as he knew, Wilson and defendant were not dating at the time of the incident.

¶ 33    Chicago police officer Joseph Fernandez testified that, on November 24, 2010, he was working on a "current kidnapping case" and attempting to locate defendant based on "cellphone technology." His investigation led his team to an address on the 5500 block of Marshfield Avenue. At that location, his team entered a residence and located Roberts, who was the kidnapping victim. Defendant was not at the apartment, but they located him across the street. He identified defendant in court as the suspect that he arrested in connection with the kidnapping.

¶ 34    Defense counsel moved for a directed finding, arguing the evidence was too inconsistent for the State to have met its burden of proof. Specifically, counsel argued Wilson was not a credible witness, could not answer basic questions, and was impeached on most of her testimony. Counsel further argued Charles Jr. and Roberts gave differing accounts of the shooting incident and were both impeached by prior testimony. The State acknowledged the inconsistencies in the testimony, but argued the incidents happened five years prior to trial and the witnesses testified credibly to the "big issues" about what "happened to them." The court denied the motion but stated it was "not discounting the impeachment."

¶ 35    For the defense, registered nurse Cynthia Patterson testified she was working as a triage nurse on December 1, 2010, at Provident Hospital. Patterson identified Wilson's medical records, which she used to refresh her recollection of Wilson's treatment. Patterson treated Wilson, whose primary complaint was a headache from being hit with a gun, although she did not indicate who hit her. Wilson also had burns. Wilson did not complain of being pregnant or being forced to drink bleach. She "walked in[to]" the hospital, as opposed to being transported by ambulance. It was

standard for Patterson to inquire about domestic violence when working as a triage nurse. Wilson indicated that she was afraid of her "partner slash family member" and responded affirmatively when asked about "partner emotionally or physically abuse [*sic*]." Patterson did not know whom Wilson was dating at the time.

¶ 36    The parties stipulated that, if called, Chicago Fire Department paramedics Julie Hickey and Nicole Kiernicki would testify they transported a gunshot victim from a residence on the 5500 block of Wolcott to the hospital on the morning of November 24, 2010. The patient "was shot at once. The bullet grazed his arm, grazed his abdomen and lodged itself under the skin about two inches above his navel.'" The parties further stipulated that, if called, Chicago Police Department telephone liaison police officer Mary Bickham would testify she requested phone records on November 24, 2010, in connection with a kidnapping investigation and tendered the documents to Officer Rodriguez.

¶ 37    The defense introduced into evidence the preliminary hearing transcript of Roberts's testimony from December 1, 2010.

¶ 38    Following arguments, the court found defendant guilty in case number 12 CR 5787 of four counts of aggravated kidnapping, two counts of aggravated domestic battery, and one count of aggravated battery with use of a firearm with respect to Wilson. It specified it "listened very carefully to all the witnesses that testified" and "observed their demeanor while testifying." The court found there was "obviously" "no question" that Wilson had been impeached, especially regarding her pregnancy, which the court considered "more of a peripheral issue" which went to "her credibility in total." Nevertheless, the court believed Wilson's testimony that she had been confined in defendant's apartment where she was beaten and burned. It stated there was "no

question" that defendant struck Wilson with a gun and his hands and burned her. It observed her demeanor as she testified, noting "[s]he was very traumatized, she was crying, it was not an act. She was very traumatized by [defendant] when she testified, there's no question about that." The court additionally believed Thomas's testimony, and stated it believed "that's exactly what happened" regarding how the police reacted when he took Wilson to the stations. The court found defendant not guilty of heinous battery for pouring bleach on Wilson's burns or forcing her to drink bleach.

¶ 39    With respect to case number 10 CR 21516, the court found defendant guilty of home invasion for entering Charles Sr.'s dwelling and using force against Hallom, home invasion for entering Charles Jr.'s dwelling and using force against Charles Jr. while armed with a firearm, home invasion for entering Charles Jr.'s dwelling and using force against Charles Jr. during which he personally discharged a firearm, and aggravated battery of Charles Jr. The court found it believed Wilson had the opportunity to leave defendant's apartment but was "scared as could be and was petrified of [defendant] and did not leave," which was why defendant went looking for her at Charles Sr.'s house when she eventually fled. It noted that there was "some impeachment" with respect to the witnesses at Charles Sr.'s house. However, it believed defendant used force against Hallom, although she did not identify defendant. The court believed Charles Jr.'s and Roberts's testimony that defendant was the perpetrator. In so finding, the court noted, "Granted, we don't know how he entered, but clearly, he did not ask permission to enter with a gun and threatened people in that dwelling place." It additionally stated there was "no question" defendant shot Charles Jr., personally discharged the firearm, and was identified.

¶ 40    The court found the evidence did not show defendant intended to kill Charles Jr. and found him not guilty of attempted murder. It further acquitted him of home invasion with respect to Roberts, aggravated kidnapping of Roberts, noting that, although it believed other portions of Roberts's testimony, it was not "convinced beyond a reasonable doubt" that defendant kidnapped Roberts.

¶ 41    The court denied defendant's motion for a new trial. At sentencing, in case number 12 CR 5787, the court merged the counts of aggravated kidnapping, aggravated domestic battery, and aggravated battery into one count of aggravated kidnapping (720 ILCS 5/10-2(a)(6) (West 2010)) and sentenced defendant to 45 years' imprisonment. In case 10 CR 21516, the court merged the home invasion counts and sentenced defendant to 50 years' imprisonment on one count of home invasion premised on his entering the dwelling of Charles, Jr., using force against him, and personally discharging a firearm (720 ILCS 5/12-11(a)(4) (West 2010)). It sentenced him to a concurrent 30-year term for aggravated battery. The sentence in case number 12 CR 5787 was to be concurrent with the sentences in case number 10 CR 21516. The court denied defendant's motion to reconsider sentence.

¶ 42                                    **ANALYSIS**

¶ 43    On appeal, defendant first argues the evidence was insufficient to establish that he committed aggravated kidnapping, home invasion, and aggravated battery because Wilson, Charles Jr., and Roberts were incredible and no additional evidence was presented linking him to the charged offenses.

¶ 44    When reviewing a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted). *People v. Davison,* 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43), and we do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens,* 237 Ill. 2d 311, 334 (2010). Further, it is within the province of the trier of fact "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *Siguenza-Brito*, 235 Ill. 2d at 228. A defendant's claim that a witness was not credible, standing alone, is insufficient to reverse a conviction. *Id.*

¶ 45 To convict defendant of aggravated kidnapping of Wilson as charged, the State was required to prove he committed "the offense of kidnaping [*sic*] while armed with a firearm." 720 ILCS 5/10-2(a)(6) (West 2010). A person commits the offense of kidnapping when he knowingly "by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will." 720 ILCS 5/10-1(2) (West 2010).

¶ 46 To sustain defendant's conviction for home invasion, the State had to show (1) defendant was not a police officer acting in the line of duty, (2) defendant knowingly made an unauthorized entry into the dwelling of Charles, Jr., (3) defendant knew or had reason to know that one or more persons were present therein, (4) used force or threatened the imminent use of force upon Charles, Jr. within the place whether or not injury occurred, and (5) personally discharged a firearm. 720

ILCS 5/12-11(a)(4) (West 2010). To prove defendant guilty of aggravated battery, the State needed to prove defendant, in committing a battery on Charles, Jr., discharged a firearm and caused any injury to another person. 720 ILCS 5/12-4.2(a)(1) (West 2010). An individual commits battery when he intentionally or knowingly, without legal justification, causes bodily harm to an individual. 720 ILCS 5/12-3(a) (West 2010).

¶ 47    Defendant does not allege that the State failed to prove a particular element of the offenses of which he was convicted. Rather, defendant contends that the evidence was insufficient because the testimony identifying him as the perpetrator was rife with inconsistencies. Defendant maintains the State's witnesses' Wilson, Charles, Jr., and Roberts were incredible, reciting a litany of inconsistencies and impeachments in their testimonies. We are unpersuaded by this contention. A conviction will not be reversed simply because the evidence was contradictory, or defendant claims a witness was not credible. *Siguenza-Brito*, 235 Ill. 2d at 228. "[C]ontradictory testimony does not necessarily destroy the credibility of a witness[.]" *Gray*, 2017 IL 120958, ¶ 47. It is the duty of the factfinder to determine if and when the witness testified truthfully, and how flaws in part of the testimony affected the credibility of the whole testimony. *Id.*

¶ 48    Here, the evidence showed that defendant, while armed with a gun hidden in his sleeve, told Wilson to go with him to his apartment or he would shoot her family. After forcing Wilson to go to his apartment, defendant tied her up, hit and burned her, and kept her overnight until she was able to escape the following morning after defendant left the apartment. Wilson testified that defendant had the gun on his person while she was confined to his apartment. The evidence further showed that, after Wilson fled the apartment, defendant went looking for her at Charles Jr.'s home, which he entered without authorization. Hallom, Charles Jr., and Roberts all agreed that defendant

appeared in the kitchen and was not invited inside. At the time he entered the house, defendant was armed with a firearm and shot Charles Jr., who testified defendant pointed a gun at him, which initially misfired, before firing again when Charles Jr. returned to the bathroom. Charles Jr. testified the bullet grazed his arm and entered his abdomen. He showed the court his scars from the bullet wound at trial and testified the bullet was still lodged in his stomach.

¶ 49   The record reveals that the trial court determined that the testimony, while inconsistent on some points, was credible and consistent with respect to the main issues underlying the convictions. We are not persuaded by defendant's argument that the evidence was insufficient because the State's witnesses were impeached, and their testimony was incredible. The determination of the credibility of the witnesses and the resolution of any conflicts in the evidence was within the province of the trial court (*Siguenza-Brito*, 235 Ill. 2d at 228), which heard defense counsel make these same arguments in closing and expressly found there was "no question" that defendant confined Wilson to his apartment and then beat and burned her and subsequently entered Charles Jr.'s and Sr.'s home without authority and shot Charles Jr.

¶ 50   The record shows that the court acknowledged the contradictions and inconsistencies in the evidence given by the State's witnesses, and in fact found defendant not guilty of certain offenses based on the inadequacy of the testimony. The court found the witnesses were credible overall with regard to the home invasion, aggravated battery, and aggravated kidnapping charges at issue here. *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 (noting the trier of fact may accept or reject as much or as little of a witness's testimony as it pleases). The court specifically found that Wilson had been impeached on "peripheral" matters, but that it believed her account of being confined by defendant. The court noted she had clearly been traumatized by defendant. Although

it rejected certain parts of Roberts's testimony, it believed that the witnesses positively identified defendant as the perpetrator. It was the trial court's duty to determine how the contradictions affected the credibility of each witness' entire testimony. *Gray*, 2017 IL 120958, ¶ 47. Based on the record before us, we find no reason to disturb the trial court's credibility determinations.

¶ 51 Defendant next argues that under the one-act, one-crime doctrine, his conviction for aggravated battery should have merged into his conviction for home invasion because they arose from the same physical act: personal discharge of a firearm when he shot Charles Jr. in the stomach. He therefore requests that this court vacate his conviction for aggravated battery. While defendant failed to raise this issue in the trial court, we may review his claim of error for plain error as "a violation of the one-act, one-crime doctrine affects the integrity of the judicial process, thus satisfying the second prong of the plain-error analysis." *People v. Span,* 2011 IL App (1st) 083037, ¶ 81.

¶ 52 Under the one-act, one-crime doctrine, a defendant may not be convicted of multiple offenses based on the same physical act. *People v. Johnson,* 237 Ill. 2d 81, 97 (2010); see *People v. Miller,* 238 Ill. 2d 161, 165 (2010) ("Multiple convictions are improper if they are based on precisely the same physical act."). However, "if the convictions were based on separate and distinct acts requiring different elements of proof, *** the offenses did not arise from the same conduct." *People v. King,* 66 Ill. 2d 551, 562 (1977). When evaluating whether a conviction violates the one-act, one-crime rule, we must determine (1) whether the defendant committed multiple acts and (2) if so, whether any of the charges are lesser-included offenses. *King*, 66 Ill. 2d at 566; *People v. Rodriguez,* 169 Ill. 2d 183, 186 (1996). We review *de novo* whether a

defendant's convictions violate the one-act, one-crime doctrine. *People v. Csaszar,* 375 Ill. App. 3d 929, 943 (2007).

¶ 53     In this case, defendant was convicted of home invasion and aggravated battery. The home invasion count alleged, in relevant part, that defendant, without authority, knowingly entered the dwelling place of Charles Jr., used force or threatened the use of force upon Charles Jr., whether or not injury occurred, and during the commission of the offense personally discharged a firearm. See 720 ILCS 5/12-11(a)(4) (West 2010). The aggravated battery count alleged that, in committing a battery, he knowingly or intentionally caused injury to another by means of discharging a firearm, by shooting Charles Jr. See 720 ILCS 5/12-4.2(a)(1) (West 2010).

¶ 54     We first turn to whether defendant's conduct consisted of separate acts or a single physical act. In *King*, our supreme court defined an act as "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. Where there are multiple acts, their interrelationship does not preclude multiple convictions. *Rodriguez,* 169 Ill. 2d at 189. Offenses that share a common act may result in multiple convictions where the defendant commits a second outward manifestation that supports a second offense. *Id.*

¶ 55     We find the convictions for home invasion and aggravated battery were not based on a single, physical act. Although they shared the common act of personally discharging a firearm, the "entry into a dwelling" element of home invasion is not an element of aggravated battery. Compare 720 ILCS 5/12-4.2(a)(1) (West 2010) with 720 ILCS 5/12-11(a)(4) (West 2010); see *People v. Marston,* 353 Ill. App. 3d 513, 519 (2004) (finding convictions for aggravated battery and home invasion did not violate the one-act, one-crime doctrine "despite the infliction of only one injury because defendant's entry into the home was a separate act on which the home invasion charge

was based"); see also *People v. Tate*, 106 Ill. App. 3d 774, 778 (1982) (finding home invasion and aggravated battery were not carved from the same act because "entry by the assailant in[to] the *** home was a separate act which was an important and required part only of the home invasion offense"). Therefore, the convictions for home invasion and aggravated battery were not based on a single physical act.

¶ 56 Next, we consider whether, as defendant contends, the aggravated battery offense is a lesser-included offense of home invasion. As charged here, it is not. See *People v. Fitzgerald*, 313 Ill. App. 3d 76, 78 (2000) (collecting cases). An offense is deemed a lesser-included offense where all the elements are included within a second offense and the first offense contains no element not included in the second offense. *People v. Miller,* 238 Ill. 2d 161, 166 (2010). Aggravated battery as charged here requires an injury (720 ILCS 5/12-4.2(a)(1) (West 2010)), whereas home invasion as charged in this case does not require an injury (720 ILCS 5/12–11(a)(4) (West 2010)). Therefore, we find that aggravated battery is not a lesser-included offense of home invasion. Accordingly, the separate convictions do not violate the one-act, one-crime doctrine.

¶ 57                                                 **CONCLUSION**

¶ 58 Based on the foregoing, we affirm the judgment of the circuit court of Cook County.

¶ 59 Affirmed.