(No. 106219.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. TROY DAVISON, Appellee.

*Opinion filed April 2, 2009.*

Lisa Madigan, Attorney General, of Springfield, and
Dennis E. Simonton, State's Attorney, of Marshall
(Michael A. Scodro, Solicitor General, and Michael M.
Glick and Michael R. Blankenheim, Assistant Attorneys
General, of Chicago, and Norbert J. Goetten, Robert J.
Biderman and Anastacia R. Brooks, of the Office of the
State's Attorneys Appellate Prosecutor, of Springfield, of
counsel), for the People.

Michael J. Pelletier, State Appellate Defender, Gary

R. Peterson, Deputy Defender, and Michael H. Vonnah-
men, Assistant Appellate Defender, of the Office of the
State Appellate Defender, of Springfield, for appellee.

JUSTICE THOMAS delivered the judgment of the
court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Kil-
bride, Garman, Karmeier, and Burke concurred in the
judgment and opinion.

## OPINION

Defendant, Troy Davison, was arrested while trans-
porting a 30-pound cylinder containing anhydrous am-
monia, a key ingredient in the manufacture of metham-
phetamine. The State charged him with possession of a
deadly substance (720 ILCS 5/20.5—6(a) (West 2004)),
and a jury in the circuit court of Clark County found him
guilty of that offense. Defendant appealed, arguing that
the State failed to prove his guilt beyond a reasonable
doubt. A majority of the appellate court agreed with
defendant and reversed his conviction. 378 Ill. App. 3d
1010. The State now appeals to this court. For the
reasons that follow, we reverse the appellate court's deci-
sion.

## BACKGROUND

Section 20.5—6(a) of the Criminal Code of 1961
makes it a Class 1 felony to "possess[ ], manufacture[ ]
or transport[ ] any poisonous gas, deadly biological or
chemical contaminant or agent, or radioactive substance
*** with the intent to use such gas, biological or chemi-
cal contaminant or agent, or radioactive substance to
commit a felony." 720 ILCS 5/20.5—6(a) (West 2004).
Here, the State's information alleged that defendant
"knowingly possessed a poisonous gas, anhydrous am-
monia, with the intent to commit a felony, being the

manufacture of methamphetamine." For purposes of this appeal, no one disputes that the State sufficiently proved that defendant possessed anhydrous ammonia, or that he did so with the intent to use it in the manufacturing of methamphetamine. The sole point of contention is whether the State proved that defendant possessed a "poisonous gas." Accordingly, we will set forth only the facts germane to that question.

The State's first witness was Hunter David, a deputy patrolman with the Clark County sheriff's office. Deputy David testified that, on the evening of December 23, 2003, he issued a citation to defendant for driving with a suspended license. After issuing the citation, Deputy David conducted an inventory search of defendant's pickup truck, during which he discovered a 30-pound cylinder labeled "Propane Flammable." However, based upon the distinct odor emanating from the cylinder, the modified valve that had been affixed to the cylinder, and the bluish-green discoloration of the modified valve, Deputy David knew immediately that the cylinder contained anhydrous ammonia, not propane. Deputy David then explained that he had received specialized training in the investigation, processing, and dismantling of methamphetamine labs, including a 40-hour course at the Drug Enforcement Agency's (DEA's) academy in Quantico, Virginia. The DEA course included instruction on the hazards and handling of anhydrous ammonia. Based upon this training, Deputy David was able to testify that anhydrous ammonia is a "deadly substance" that can "blind you very easily" if it enters the eyes and can "swell your throat enough that you would suffocate" if inhaled in sufficient quantity. Because of this, police officers are trained to wear a Tyvex chemical suit, a respirator, boots, and rubber gloves before handling or coming in contact with anhydrous ammonia. On cross-examination, Deputy David acknowledged that he was

not wearing protective gear when he discovered and inspected the modified propane tank in the bed of defendant's pickup truck. He explained, however, that this was both because he "didn't realize [he] was going to come across the tank" and because "being outside, not in a closed environment, there was no threat \*\*\* that I was going to be doused or splashed with anhydrous ammonia."

The State's next witness was Richard Shutter, also a deputy with the Clark County sheriff's office. Deputy Shutter was the second officer to respond to the location of defendant's pickup truck on the evening of December 23. Once there, Deputy Shutter "slightly cracked" the valve on the modified propane tank to release a small amount of the gas contained within it. Based upon the odor of the gas, Deputy Shutter knew immediately that the tank contained anhydrous ammonia. Like Deputy David, Deputy Shutter testified that he had received specialized training in matters relating to the manufacture of methamphetamine. Based upon this training, as well as his personal involvement in numerous arrests and seizures arising from the manufacture of methamphetamine, Deputy Shutter was familiar with anhydrous ammonia and knew that it is a "toxic chemical that can be fatal and extremely harmful to your lungs if ingested." On cross-examination, Deputy Shutter acknowledged that he did not wear any protective gear when he cracked the valve on the modified propane tank, explaining that he "felt [he] could stay upwind of it and remain relatively safe."

The State next called Jerry Parsley, the sheriff of Clark County. Sheriff Parsley began by explaining that he had been trained in both the handling of anhydrous ammonia and the processing of methamphetamine labs. This training occurred in the private sector as well as at the DEA academy in Quantico. Based upon this training,

Sheriff Parsley was able to testify that the inhalation of anhydrous ammonia "will burn the linings of your lungs," "can cause death," and "could be fatal very quick." In addition, Sheriff Parsley testified that he handled the disposal of the modified propane tank found in the bed of defendant's pickup truck. According to Sheriff Parsley, after confirming that the tank contained anhydrous ammonia, he transported the tank to the Clark County Sportsman's Club, which is located in a remote part of the county and far from any residences. Once there, Sheriff Parsley put on rubber gloves, a firefighter's coat, and an air-purifying respirator to protect him from exposure to the anhydrous ammonia. He then placed the tank in a field and shot it several times with a gun from a distance of at least 20 yards, releasing the anhydrous ammonia into the atmosphere. After waiting 30 minutes, Sheriff Parsley approached the tank and confirmed that it was empty. He then transported the tank to the sheriff's office garage, where it was secured. Sheriff Parsley explained that he shot the tank both because this is the safest method of releasing the anhydrous ammonia and because, on prior occasions, the DEA had refused to handle or transport such tanks as long as they contained anhydrous ammonia.

The State next called Robert Kruse, an Illinois state trooper who specializes in motor carrier safety and hazardous materials transportation. Trooper Kruse explained that both state and federal shipping regulations classify anhydrous ammonia as a Hazard Zone D substance, which means that "there is a lethal dosage to fifty percent or more of a test group, usually rats, at [concentrations of] three thousand to five thousand per million." As far as exposure to humans is concerned, Trooper Kruse explained that most people can start to smell anhydrous ammonia at around 20 parts per million and that, once the concentration reaches 500 parts per million:

"[Y]our throat will shut down, you won't be able to breathe. You will probably collapse, and you won't be able to *** self rescue. You won't be able to walk away from the spill. So once you get over five hundred, you're probably going to be in great danger."

According to Trooper Kruse, whenever a Hazard Zone D substance such as anhydrous ammonia is shipped domestically, state and federal regulations require the vessel containing that substance to bear a label stating "Inhalation Hazard," which indicates that the substance being transported could cause "either great serious bodily harm or death" if inhaled. When shipped internationally, the vessel must also bear a skull and crossbones image and an additional label stating "Poisonous Gas."

The State's final witness was Troy Wesley, an agent with the Southeastern Illinois Drug Task Force. Agent Wesley testified about prior encounters he had had with defendant, as well as about the process of manufacturing methamphetamine. Unlike the previous witnesses, Agent Wesley offered no testimony concerning the nature or hazards of anhydrous ammonia.

The State then rested its case, and defendant moved for a directed verdict. The trial court denied that motion, and defendant immediately rested his case as well. The jury found defendant guilty of possessing a deadly substance, and the trial court later sentenced him to 26 years in prison.

Defendant appealed, arguing that the State had failed to prove him guilty beyond a reasonable doubt because anhydrous ammonia is not a "poisonous gas" for purposes of section 20.5—6. A majority of the appellate court agreed and reversed defendant's conviction. The majority's analysis began by noting that section 20.5—6 does not define the term "poisonous gas."[1] The majority therefore consulted Webster's Third New International

---

[1]Throughout its analysis, the appellate court below borrowed

Dictionary to ascertain the phrase's meaning. According to Webster's, something is "poisonous" if it "is poison" or "has the qualities or effects of poison." Webster's Third New International Dictionary 1751 (1993). "Poison," in turn, is defined as "a substance (as a drug) that in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism." Webster's Third New International Dictionary 1751 (1993). The majority then noted that Webster's also contains a definition for the phrase "poison gas," which is "a poisonous gas or a liquid or solid giving off poisonous vapors designed (as in chemical warfare) to kill, injure, or disable by inhalation or contact." Webster's Third New International Dictionary 1751 (1993). Based upon these definitions, the majority concluded that, as used in section 20.5—6, the phrase "poisonous gas" can mean either (1) a gas that "in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism," or (2) a gas that is "designed (as in chemical warfare) to kill, injure, or disable by inhalation or contact." The majority therefore declared section 20.5—6 ambiguous and proceeded to employ a series of aids to statutory construction. 378 Ill. App. 3d at 1016.

The majority first invoked the familiar doctrine that, where ambiguous, a penal statute should be construed to afford lenity to the accused. 378 Ill. App. 3d at 1016. Next, the majority applied the doctrine of *noscitur a sociis*, which provides that a word is known by the company it keeps. Under this rule of construction, the

---

heavily from the decision in *People v. Qualls*, 365 Ill. App. 3d 1015 (2006), which addressed the same issue presented here. For the sake of clarity, we will cite only to the appellate court's opinion below, omitting the corresponding citation to *Qualls*, which should simply be assumed throughout.

meaning of ambiguous words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it. Here, the majority explained, the term "poisonous gas" appears in conjunction with the terms "deadly substance" and "deadly biological or chemical contaminant or agent." This indicates that the term "poisonous gas" is intended to mean an "inherently deadly or injurious gas, as opposed to a potentially deadly or injurious gas." 378 Ill. App. 3d at 1016.[2]

The majority then examined the legislative history of section 20.5—6. This history reveals that, when section 20.5—6 was being voted on in the Senate, its sponsor described it to the chamber as an " 'anticrime initiative' *** aimed at terrorism." 91st Ill. Gen. Assem., Senate Proceedings, March 25, 1999, at 106 (statements of Senator Dillard). Similarly, during a subsequent proceeding before the House Criminal Law Judiciary Committee, a legislator noted that section 20.5—6 was necessary because Illinois had no law criminalizing the possession of "biological warfare chemicals" or "poison gas" such as "sarin gas." From these comments, the majority concluded that section 20.5—6 was enacted to criminalize the unlawful possession of inherently deadly or injurious substances, such as gases designed, as in chemical warfare, to kill, injure, or disable by inhalation or contact. 378 Ill. App. 3d at 1017.

Finally, the majority declared that, " '[i]n determining the intention of the General Assembly ***, it is permissible to look to later actions of the legislature.' " 378 Ill. App. 3d at 1017, quoting *Gregory v. County of La-Salle*, 91 Ill. App. 2d 290, 297 (1968). Here, the majority

---

[2]Notably, the majority neglected to mention that the phrase "poisonous gas" likewise appears in conjunction with the phrase "radioactive substance," which unlike the phrase "deadly biological or chemical contaminant or agent," describes something that can be possessed for wholly benign purposes.

looked to the fact that, six years after enacting section 20.5—6, the General Assembly enacted section 25 of the Methamphetamine Control and Community Protection Act, which makes it either a Class 1 or a Class X felony to "possess, procure, transport, store, or deliver anhydrous ammonia with intent it be used to manufacture methamphetamine." 378 Ill. App. 3d at 1017, citing 720 ILCS 646/25(a)(1) (West Supp. 2005). According to the majority, the passage of this law, six years after the enactment of section 20.5—6, "supports the conclusion that the term 'poisonous gas' in section 20.5—6 of the Code was not meant to include anhydrous ammonia." 378 Ill. App. 3d at 1017.

Based upon all of these considerations, the majority concluded that, as used in section 20.5—6, the phrase "poisonous gas" refers only to those gases that are designed, as in chemical warfare, to kill, injure, or disable by inhalation or contact. The majority then declared that anhydrous ammonia does not fit within this definition. As a result, the State failed to prove defendant guilty of possessing a deadly substance, and the majority reversed defendant's conviction. 378 Ill. App. 3d at 1017.

Justice Myerscough dissented. In her view, the phrase "any poisonous gas," as used in section 20.5—6(a), is not ambiguous and is clearly broad enough to include both gases that have *the potential to be* harmful or fatal, such as anhydrous ammonia or chlorine, and gases that are *designed to be* harmful or fatal, such as sarin gas or mustard gas. Accordingly, the majority had no basis for looking beyond the statutory text or employing any aids to construction. 378 Ill. App. 3d at 1021-22 (Myerscough, J., specially concurring in part and dissenting in part).

We granted the State's petition for leave to appeal. 210 Ill. 2d R. 315.

## DISCUSSION

The issue we must decide is whether the State proved

beyond a reasonable doubt that defendant possessed a "poisonous gas." This is a two-part inquiry. First, we must decide what the phrase "any poisonous gas" means. Second, we must decide whether, in light of that definition, the State met its burden of proof.

We begin with the statute, and the rules governing our inquiry are familiar. The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *People v. Ramirez*, 214 Ill. 2d 176, 179 (2005). The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Ramirez*, 214 Ill. 2d at 179. When the statute contains undefined terms, it is entirely appropriate to employ a dictionary to ascertain the plain and ordinary meaning of those terms. *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 15-16 (1991). Where the language is clear and unambiguous, we will apply the statute without resort to further aids of statutory construction. *Ramirez*, 214 Ill. 2d at 179. The construction of a statute is a question of law that is reviewed *de novo*. *Ramirez*, 214 Ill. 2d at 179.

Section 20.5—6(a) makes it a Class 1 felony to possess, manufacture, or transport any "poisonous gas" with the intent to use that gas to commit a felony. 720 ILCS 5/20.5—6(a) (West 2004). Although section 20.5—6(a) does not contain a definition for the phrase "poisonous gas," the meaning of that phrase is easily ascertained. As the appellate court correctly noted, Webster's defines something as "poisonous" if it "is poison" or "has the qualities or effects of poison." Webster's Third New International Dictionary 1751 (1993). "Poison," in turn, is defined as "a substance (as a drug) that in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism." Webster's Third New International Dictionary 1751 (1993). With this information, we can conclude

only that a "poisonous gas" is a gas that "in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism." Indeed, this is the only definition that Webster's permits, and there is nothing the least bit ambiguous about it.

The appellate court, however, was convinced that an ambiguity exists because Webster's also contains a definition for the phrase "poison gas," and that definition is far more restrictive than the one identified above. According to Webster's, "poison gas" is "a poisonous gas or a liquid or solid giving off poisonous vapors designed (as in chemical warfare) to kill, injure, or disable by inhalation or contact." Webster's Third New International Dictionary 1751 (1993). Obviously, the class of gases that are specifically designed for chemical warfare is much narrower than the class of gases that in suitable quantities have properties harmful or fatal to an organism. And just as obviously, which of these two definitions is applied to section 20.5—6(a) dramatically impacts the scope of that statute's reach. To put it bluntly, if the statute covers any gas that in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism, then defendant in this case could properly be found guilty of possessing a deadly substance. By contrast, if the statute covers only those gases that are specifically designed for chemical warfare, then defendant in this case could *not* properly be found guilty of possessing a deadly substance. For this reason, the appellate court concluded that the failure to define the phrase "poisonous gas" rendered section 20.5—6(a) ambiguous and justified the use of further aids to statutory construction.

The problem with the appellate court's approach is that it treats the two definitions identified above as *competing* definitions of the phrase "poisonous gas,"

when in fact this is not the case. Contrary to the appellate court's belief, "poison gas" is not *synonymous with* "poisonous gas." Rather, "poison gas" is a term of art that describes a narrow and well-defined subset of poisonous gases. Webster's itself makes this apparent. Again, according to Webster's, a gas is "poisonous" if it "in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism." By contrast, Webster's defines "poison gas" as "a poisonous gas *** designed (as in chemical warfare) to kill, injure, or disable by inhalation or contact." This definition makes quite clear that "poison gas" is *a specific type of* "poisonous gas"— namely, one that is designed, as in chemical warfare, to kill, injure, or disable by inhalation or contact. See also New Oxford American Dictionary 1311 (2d ed. 2005) (defining "poison gas" as "a poisonous gas or vapor, *used esp. to disable or kill an enemy in warfare*" (emphasis added)); Random House Dictionary of the English Language 1111 (1983) (defining "poison gas" as "any of various toxic gases, *esp. those used in chemical warfare to kill or incapacitate on inhalation or contact*" (emphasis added)); New Columbia Encyclopedia 2175 (1975) (defining "poison gas" as "any of various gases *sometimes used in warfare or riot control because of their poisonous or corrosive nature*" (emphasis added)); World Book Dictionary 1610 (2007) (defining "poison gas" as "a poisonous gas, such as mustard gas, *used esp. as a weapon in warfare*" (emphasis added)).

Once it is understood that "poison gas" and "poisonous gas" are not interchangeable phrases, any possible ambiguity in the statute disappears. Indeed, had the legislature intended to limit section 20.5—6(a)'s reach to only those gases designed for use in chemical warfare, it easily could have done so by employing the phrase "poison gas," which is a term of art that is commonly

understood to mean only those types of gases. It did not do that, however. Instead, it employed the far broader and much more general phrase "poisonous gas," which is commonly understood to include not only "poison gas" but also every gas that in suitable quantities has properties harmful or fatal to an organism. Again, our task is to ascertain and give effect to the legislature's intent, the best indication of which is the statutory language, given its plain and ordinary meaning. *Ramirez*, 214 Ill. 2d at 179. Here, the statutory language, given its plain and ordinary meaning, permits but one conclusion: that section 20.5—6(a) applies not just to gases *designed* to kill or injure, but to any gas that in suitable quantities has properties harmful or fatal to an organism. Consequently, and contrary to the majority's conclusion below, there is no reason to look beyond that language for external clues to section 20.5—6(a)'s meaning. See *Ramirez*, 214 Ill. 2d at 179.

Now that we know what section 20.5—6(a) means, the next question becomes whether the State proved defendant's guilt beyond a reasonable doubt. On this question, our standard of review is far more deferential. When reviewing the sufficiency of the evidence in a criminal case, a reviewing court's inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). This standard applies in all criminal cases, regardless of the nature of the evidence. *Cunningham*, 212 Ill. 2d at 279.

Here, defendant was charged with possession of a deadly substance under section 20.5—6, which makes it a Class 1 felony to, *inter alia*, possess any poisonous gas with the intent to use such gas to commit a felony. 720 ILCS 5/20.5—6(a) (West 2004). And again, no one disputes that the State proved beyond a reasonable doubt both that defendant possessed anhydrous ammonia and that he did so with the intent to use it in the commission of a felony. The only question, then, is whether the State proved beyond a reasonable doubt that anhydrous ammonia is a "poisonous gas" for purposes of section 20.5—6(a). Clearly, it did.

We now know that, as used in section 20.5—6(a), the phrase "poisonous gas" refers to any gas that in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism. On this point, the State introduced overwhelming evidence from numerous qualified witnesses establishing that anhydrous ammonia is just such a gas. Deputy David testified that anhydrous ammonia is a "deadly substance" that can "blind you very easily" if it enters the eyes and can "swell your throat enough that you would suffocate" if inhaled in sufficient quantity. Deputy Shutter testified that he was familiar with anhydrous ammonia and knew that it is a "toxic chemical that can be fatal and extremely harmful to your lungs if ingested." Sheriff Parsley testified that the inhalation of anhydrous ammonia "will burn the linings of your lungs," "can cause death," and "could be fatal very quick." In addition, Sheriff Parsley testified that, before disposing of the tank found in defendant's truck, he put on rubber gloves, a firefighter's coat, and an air-purifying respirator to protect him from exposure to the anhydrous ammonia. Finally, Trooper Kruse testified that most people can start to smell anhydrous ammonia at around 20 parts per million and that, once the concentration reaches 500 parts per million:

"[Y]our throat will shut down, you won't be able to breathe. You will probably collapse, and you won't be able to *** self rescue. You won't be able to walk away from the spill. So once you get over five hundred, you're probably going to be in great danger."

In addition, Trooper Kruse explained that, when shipped domestically, state and federal regulations require any vessel containing anhydrous ammonia to bear a label stating "Inhalation Hazard," which indicates that the substance being transported could cause "either great serious bodily harm or death" if inhaled. When shipped internationally, such a vessel must also bear a skull and crossbones image and an additional label stating "Poisonous Gas." In light of this evidence, all of which was uncontested, we have little difficulty concluding that a rational trier of fact easily could have found beyond a reasonable doubt that defendant possessed a "poisonous gas" for purposes of section 20.5—6(a). In fact, it is difficult to imagine how any *other* conclusion could have been possible.

## CONCLUSION

As used in section 20.5—6(a), the phrase "poisonous gas" refers to any gas that in suitable quantities has properties harmful or fatal to an organism when it is brought into contact with or absorbed by the organism. The State presented overwhelming evidence that anhydrous ammonia is just such a gas, and defendant does not contest the sufficiency of the State's case in any other respect. Accordingly, we reverse the appellate court's decision and affirm defendant's conviction.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*