2020 IL App (1st) 170986-U

No. 1-17-0986

Order filed December 18, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 7939 |
| | ) | |
| MARK CLEMONS, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for possession of a stolen motor vehicle over his contention that the evidence was insufficient to prove him guilty.

¶ 2    Following a bench trial, defendant Mark Clemons was convicted of possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2014)) and sentenced to 10 years' imprisonment.

On appeal, he contends the evidence was insufficient to prove him guilty beyond a reasonable doubt. For the following reasons, we affirm.[1]

¶ 3 Defendant was charged with possession of a stolen motor vehicle. At trial, Rafael Magana testified that, on April 14, 2015, he was driving in his black 1997 Chevy Monte Carlo just before 6 a.m. on his way to work. His wife, Estella Garcia, was sleeping in the backseat of the car. He stopped for gas at a station on the corner of 45th Street and Ashland Avenue. Magana left the keys in the ignition and went inside to pay the attendant. Garcia, who could not drive, was still in the backseat of the car. When Magana looked outside for the pump number, he saw his vehicle was gone. He told the attendant to call 911. Magana did not see who drove away in his vehicle. He saw his vehicle later that evening when police took him to a parking lot on South Wolf Road in Des Plaines, a northwest suburb. Magana did not give anyone, including defendant, permission to drive his car. Magana identified photographs of his vehicle and the license plate on the front of the vehicle.

¶ 4 Estella Garcia testified that, on the day in question, she was in the backseat of the vehicle when Magana went into the gas station to pay for gas. While Garcia was waiting, she heard the car door open and then slam shut. She initially thought it was Magana, but when she looked up, she saw an African American man in the driver's seat. Garcia was seated behind the driver's seat and could see only the back of the man's head and his eyes in the rearview mirror. She did not get a good look at his face. The man then proceeded to drive away from the gas station with her in the backseat. He told Garcia, "I'm going to kill you b***, I am going to kill you b***, I am going to

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

kill you b***," and grabbed his waist. Garcia was scared and asked the man not to hurt her. The only thing she noticed about him was that he was wearing a navy blue or black sweater hoodie.

¶ 5     When the man asked Garcia to exit the car, she told him she could not get out because the passenger door did not work. He then pulled over on Ashland, moved the driver's seat, and pulled Garcia out of the car by her arm. Garcia identified photographs of the vehicle and the license plate on the front of the vehicle. She eventually saw the car around midnight when police drove her and Magana to the parking lot of a company in the suburbs where it was found. Garcia did not know defendant and did not give him or anyone else permission to drive the car.

¶ 6     Larry Burton testified he was security director at Juno Lighting. Prior to that role, he was a police officer in Des Plaines. On April 14, 2015, he was working for Juno and was contacted early in the morning by the Chicago police department regarding a stolen vehicle on Juno property. Based on information he received, which included a make, model, and license plate number, Burton conducted a physical search and located a black Monte Carlo on the west side of the building. The license plate on the Monte Carlo matched the number he was given by police. Burton informed police the car was located on Juno's property. He verified that the car was not an employee-owned vehicle registered with the company.

¶ 7     Burton was in control of Juno's video cameras. Two cameras were located on the west and north walls. As a security officer, Burton often viewed the cameras while they were recording and could also rewind the recordings. He was able to control where the cameras pointed from a joystick in the control booth. After locating the Monte Carlo in the parking lot, he reviewed security footage recorded that day.

¶ 8    The State introduced a video clip into evidence and Burton narrated it in court. Burton stated the video started at 6:40 a.m. and showed the west wall with the black Monte Carlo driving and pulling into a parking space. A different camera angle showed someone walking away from the Monte Carlo, but Burton could not tell at that time who the individual was. The individual walked toward the entrance to the building. Our review of the video clip shows a black vehicle pulling into a parking space and a man with a light-colored hoodie under a jacket walking from the car through the parking lot.

¶ 9    Burton narrated a second video clip which showed the hallway where Burton monitored people coming into the building. In the clip, Burton identified defendant, whom he also identified in court, walking into the building. In the clip, defendant was wearing "dark pants, jacket with a light-colored hoodie on his cellphone." Burton knew it was defendant because they "spent a lot of time together in a classroom setting" on April 8, 9, and 10, 2015, when defendant, a "new hire," completed a three-day orientation for new hires. Burton had personal interactions with defendant at that time and thus recognized him in the video entering the hallway. Defendant was dressed similarly to the individual who was seen exiting the car in the previous video clip. Burton also identified defendant in court. Our review of the video clip shows a man in a light-colored hoodie under a gray jacket coming into double doors in the building. He appears to be on his cellphone and turns down a hallway out of the camera's view.

¶ 10    After viewing the video clips, Burton alerted police to the name of the person he "thought might have driven the car." Police arrived at Juno, and Burton continued to monitor the Monte Carlo by camera for the rest of the day. He knew defendant was scheduled to leave work at 3:30 p.m. that day. Burton saw defendant leave Juno and monitored him on the camera, which he could

manually control.

¶ 11    The State published another video clip, which Burton narrated. The video was timestamped 3:41 to 4 p.m. Burton identified defendant on the clip, who was walking westbound "back to his car or the direction where the car was located" in the Juno parking lot. The car was "probably" 100 yards away, parked along a wall with one car next to it. Burton had manipulated the camera in the clip. Defendant then "just changed direction." As he walked back in the parking lot, he was stopped by police.

¶ 12    Our review of this video clip shows the parking lot at 3:41:33 p.m. emptying out. A man in a gray shirt holding a jacket is walking through the parking lot. He looks around as he is walking. The camera shows him walking toward a black vehicle at the end of the parking lot and then abruptly turning around to walk back in the direction he came from. He stops at one point and appears to be speaking with someone in a silver SUV. He then continues walking through the parking lot. A black SUV cuts off his path in the parking lot and he stops as four officers exit the black SUV and detain him. The officers handcuff the man, search him, and appear to question him. The camera then pans out and swings around to show the black car sitting in the parking lot before returning to show the man handcuffed next to the black SUV with police. Other police vehicles eventually arrive in the parking lot. At 3:52, the camera swings around to show the black vehicle still parked in the parking lot. An officer walks from the area where the police vehicles are parked toward the vehicle. The camera shows another part of the parking lot that has cars.

¶ 13    Burton testified he subsequently spoke with police and went to defendant's locker, which Burton had assigned to him. Inside he found a "white wool type hoodie." Burton then locked the

locker and sealed it with a padlock. Chicago police officer Delderfield later came to retrieve the hoodie. Burton identified the hoodie and photographs of the Monte Carlo in court.

¶ 14    On cross-examination, Burton testified that, although employees were required to register their vehicles with Juno, in his experience there were occasions when employees drove an unregistered vehicle. He acknowledged that he could not identify the person in the video who had exited the Monte Carlo. He further acknowledged that, on the video, he did not see the door of the Monte Carlo opening or who was in the vehicle. In the video clip from after 3:30 p.m., in which he identified defendant walking along the West wall, there was a car parked close to the Monte Carlo and other cars parked in other areas of the lot. Burton did not see defendant "go to" the Monte Carlo or open its door and enter it in the video. He acknowledged an inventory sheet showed George Konieczny, a Juno security officer, found the hoodie.

¶ 15    On redirect, Burton testified the video showed no other cars parked by the Monte Carlo at 3:52 p.m.

¶ 16    Chicago police officer Nelson Gonzalez testified that, on April 14, 2015, he was assigned to relieve the morning team surveilling a stolen vehicle at Juno. He was with a few other officers, including Officer Delderfield. The officers were inside a black unmarked Chevy Tahoe with municipal plates parked in the Juno parking lot with a view of the vehicle they were surveilling. Around 3:40 p.m., it appeared to be the end of the workday as "tons" of people exited the Juno building and about 90 percent of the parking lot emptied out. There were few cars left when Officer Gonzalez saw defendant, whom he identified in court, exit Juno and walk toward the Monte Carlo. Defendant turned the corner to go to the Monte Carlo and then looked back towards Officer Gonzalez's vehicle, where Gonzalez was sitting with the other officers. Defendant made eye

contact with the officers and "stood there for a few seconds." He turned back towards the Monte Carlo, then turned back towards the officers, then took a few steps toward the Monte Carlo, and finally "completely turned around" and walked back toward the entrance of Juno.

¶ 17    Gonzalez drove the police vehicle toward defendant and stopped him with his team members. The officers detained defendant and questioned him. Chicago police sergeant Spearow went inside Juno and, when he returned, defendant was placed in custody. Defendant was then transported to the police station where Officer Gonzalez advised him of his *Miranda* rights. After defendant waived his rights, Officer Gonzalez questioned him around 5 p.m. While taking defendant to the restroom, defendant told Officer Gonzalez "that he didn't understand why he was there. He said he didn't do anything. He just wanted to get to work. He didn't hurt anybody." Around 9 p.m., Officer Gonzalez asked defendant if he knew where the keys to the vehicle were located and defendant said, "I didn't steal the car. But if I did I would put the keys underneath the driver's seat." Officer Gonzalez identified photographs of the Monte Carlo.

¶ 18    On cross-examination, Officer Gonzalez testified he did not see defendant enter the Monte Carlo or use a key fob or key to unlock the door. Defendant was approximately "25 spaces" away from the Monte Carlo. Officer Gonzalez did not recall seeing other cars parked near the Monte Carlo once the lot had emptied after people left for the day. Officer Gonzalez purposely drove his vehicle to block defendant's walking path. They handcuffed defendant after detaining him. Defendant did not say he stole the Monte Carlo.

¶ 19    On redirect, Officer Gonzalez testified defendant initially refused to make any statements after being *Mirandized*.

¶ 20    Chicago police officer Delderfield testified he conducted surveillance at Juno while investigating a stolen vehicle case. Defendant, whom he identified in court, was ultimately arrested. On April 15, 2015, Officer Delderfield collected a white wool sweater found in a locker at Juno. He met with George Konieczny at Juno, who opened the locker for him. Officer Delderfield then inventoried the sweater and identified it in court.

¶ 21    On cross-examination, Officer Delderfield specified he did not collect the sweater from Burton.

¶ 22    The parties stipulated that, if called, Chicago police officer Driscoll would testify after 9 p.m. on April 14, 215, he recovered "the keys" located under the driver's seat in the Monte Carlo at Juno. The State introduced into evidence a certified copy of the title of the Monte Carlo, which showed its owner was Magana. The parties further stipulated that, if called, an evidence technician with the Chicago Police Department would testify that on April 14, 2015, around 8:50 p.m. that he dusted the car, which had negative results.

¶ 23    After continuing the case in order to rewatch the video clips, the court found defendant guilty of possession of a stolen motor vehicle. In so finding, the court stated, "This is a circumstantial case. Each piece on its own is not enough on its own. As the [S]tate pointed out it's a circumstantial case but looking at the evidence in sequence looking at that time together is a complete picture. It's a different story." The court acknowledged that none of the witnesses saw defendant driving the Monte Carlo. However, it noted Burton "clearly" identified defendant in the hallway video clip. Defendant's actions in the video where he was walking toward the car and the officer's testimony that defendant turned around and walked away showed consciousness of guilt. Further, the court relied on defendant's knowledge of where the keys were located and his

statement that he "didn't hurt anyone," which it found related to the circumstances under which the Monte Carlo was taken and defendant's being in possession of the vehicle a short time later. The court found, "[Defendant] did possess that car. Albeit constructive possession. But there was evidence that [defendant] did possess that car. He was not entitled to possession, and I think there was evidence that [defendant] knew the car was stolen."

¶ 24     The court subsequently denied defendant's motion for a new trial. It sentenced defendant, as a Class X offender based on his background, to 10 years' imprisonment.

¶ 25     On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt of possession of a stolen vehicle. Specifically, he argues the evidence was insufficient to show he possessed the vehicle or, alternatively, knew the vehicle had been stolen or converted.

¶ 26     When reviewing a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison,* 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43), and we do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens,* 237 Ill. 2d 311, 334 (2010).

¶ 27     To sustain a conviction for possession of a stolen motor vehicle as charged, the State must prove beyond a reasonable doubt that defendant: (1) possessed the vehicle, (2) was not entitled to

such possession, and (3) knew the vehicle was stolen. 625 ILCS 5/4-103(a)(1) (West 2014); *People v. Cox*, 195 Ill. 2d 378, 391 (2001). Defendant challenges only the possession and knowledge elements of the offense.

¶ 28    After viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could find that defendant possessed Magana's Monte Carlo knowing it to have been stolen. The record shows that, just before 6 a.m. on April 14, 2015, when Magana was inside the gas station, a man entered Magana's Monte Carlo and drove away with Garcia still in the back seat. Video surveillance at Juno shows a man in a light hoodie walking away from the Monte Carlo approximately 40 minutes later, after it pulled into the Juno parking lot, and walking toward the entrance of the building. Additional video footage shows a man, whom Burton identified as defendant, entering Juno dressed in light-colored hoodie and gray jacket similar to the clothing worn by the man seen walking away from the Monte Carlo in the prior video clip. A light-colored sweater was later recovered from defendant's work locker.

¶ 29    Additionally, Officer Gonzalez testified defendant was walking toward the Monte Carlo later that afternoon when he saw the waiting officers, wavered briefly, and then turned around, away from the vehicle, supporting a reasonable inference of consciousness of guilt. Burton corroborated Officer Gonzalez's testimony, identifying defendant in a video clip leaving work that afternoon, walking towards the Monte Carlo, and then abruptly turning around and walking in the opposite direction. Further, although defendant denied stealing the Monte Carlo, he stated he would have hidden the keys under the driver's seat, where police subsequently recovered them. Defendant also told police he did not want to hurt anyone and just wanted to go to work. Taken

together, the evidence amply supports the conclusion that defendant was the man who drove the Monte Carlo into the Juno lot and that he knew it was stolen.

¶ 30    Defendant takes issue with the fact that the evidence in this case was circumstantial. Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish the guilt or innocence of the defendant. *People v. Saxon,* 374 Ill. App. 3d 409, 417 (2007). A defendant may be convicted solely on the basis of circumstantial evidence (*id.*), and the same standard of review applies whether the evidence is direct or circumstantial (*People v. Brown*, 2013 IL 114196, ¶ 49). The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence. *Saxon,* 374 Ill. App. 3d at 417. " 'It is sufficient if all the evidence taken as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' " *Id.* (quoting *People v. Edwards,* 218 Ill. App. 3d 184, 196 (1991)).

¶ 31    As defendant correctly states, no witnesses observed him in the Monte Carlo. However, the evidence was sufficient to enable the trier of fact to infer that defendant was the individual who possessed the Monte Carlo recovered from the Juno parking lot. The video clips showing a person in light hoodie and gray jacket walking away from the car and a person dressed similarly walking into the Juno building shortly thereafter, Burton's identification of defendant as the person who entered the building wearing the light-colored hoodie, and defendant's knowledge regarding the location of the car keys demonstrate his possession of the car. See *Siguenza-Brito*, 235 Ill. 2d at 228 (It is within the province of the trier of fact "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence."). Additionally, as noted by the trial court, defendant's consciousness of guilt can be inferred from

his abrupt turn in the parking lot upon seeing police, and his statement to police that he did not hurt anyone alludes to the circumstances under which the car was taken with Garcia still inside, which taken together demonstrate his knowledge the car was stolen or converted.

¶ 32    In reaching this conclusion, we reject defendant's arguments that the evidence is insufficient because, *inter alia*, (1) the video does not show him fleeing, (2) his statement regarding the location of the keys was offered as a hypothetical, (3) his arrival at Juno around the same time as the Monte Carlo was a coincidence, and (4) Garcia's testimony shows the offender was wearing a blue or black hoodie, not a light-colored hoodie as worn by the man walking away from the car in the video clip. While defendant interprets the evidence as portraying his innocence or inconclusive, "[a] trier of fact is not required to disregard the inferences that normally flow from the evidence or to seek out all possible explanations consistent with a defendant's innocence and elevate them to reasonable doubt." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 11. The trial court weighed the evidence here, and we do not find the evidence so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt.

¶ 33    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 34    Affirmed.