2021 IL App (1st) 190887-U

No. 1-19-0887

Order filed October 12, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 4341 |
| | ) | |
| KRISTOPHER PITTS, | ) | The Honorable |
| | ) | Thomas Joseph Hennelly, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions for aggravated assault of two police officers over his contention that the evidence was insufficient to prove his conduct placed the officers in reasonable apprehension of receiving an imminent battery.

¶ 2    Following a jury trial, defendant Kristopher Pitts was convicted of two counts of aggravated assault of a peace officer (720 ILCS 5/12-2(b)(4) (West 2014) (recodified as 720 ILCS

5/12-2(b)(4.1)) and sentenced to two concurrent terms of two years' imprisonment. On appeal, he contends the evidence was insufficient to prove him guilty beyond a reasonable doubt.

¶ 3     Defendant was charged with four counts of aggravated assault of Chicago police officers Daniel Frausto and Alfredo Pacheco. The State proceeded to trial on two counts. In relevant part, the charges alleged defendant, in committing an assault, without lawful authority, engaged in conduct which placed the officers in reasonable apprehension of receiving a battery by threatening their lives while armed with a machete, knowing they were police officers engaged in the execution of their official duties.

¶ 4     At trial, Desiree Prince testified she lived in a second-floor apartment in a two-flat building on the 600 block of North Christiana Avenue in February 2014. Defendant, his wife Kissandra Gunter, their children, and Gunter's grandparents lived on the first floor of the building. The building was surrounded by a steel gate. Inside the gate, there were five steps that led up to a vestibule to get into the building. Once inside the building, there was a door to defendant's apartment and a second door that led to stairs to get up to Prince's apartment.

¶ 5     On February 23, 2014, Prince arrived home from work around 9:15 p.m. As she approached her building, she noticed the door was open, the light was on, and defendant was inside the vestibule. He had a machete in one hand and was holding on to a German Shepard with the other hand. She identified the machete in court. Prince initially attempted to walk up the stairs but after seeing defendant with the machete and German Shepard, she was afraid, so she turned around and walked out through the gate to the sidewalk. At some point, defendant came outside to the front area of the porch with the dog, who was barking. Prince asked him repeatedly to take the dog inside because she was afraid of it and did not want to walk past it. Defendant, still holding the

machete, said he would not take the dog inside and said it was his "guardian angel." Prince noticed defendant's eyes were red, his speech was slurred, and he was speaking more slowly than normal.

¶ 6 Because defendant refused to take his dog inside, Prince called the police. Two uniformed police officers arrived approximately 20 minutes later. While she waited, defendant remained on the porch holding the machete and the dog. Prince spoke with the police outside of her neighbor's gate and the officers thereafter went to the gate at her building. She heard the officers ask defendant to put the dog and machete away. Prince again heard defendant say he would not put the dog away because it was his guardian angel. She heard him start "hollering, *** screaming, F*** the police." Defendant also stated that "he was going to sic the dogs on them" and was still holding the machete. The dog continued barking. Eventually Gunter came onto the stoop, took the machete from defendant, and returned inside with defendant. Prince heard officers asking defendant to open the door and said they were coming in, and defendant said, "[I]f you come to my house, I'm going to kill you."

¶ 7 Other members of the Chicago Police Department arrived on the scene, and Gunter came outside again. Prince watched as Gunter and "a few" police officers went upstairs to Prince's apartment "and then they disappeared." The officers kicked the door of the apartment to gain entry. While outside, Prince heard a sound "like someone had fell on the floor" and was "shaking." She could hear "the boot hitting the floor *** and the dog barking still." However, Prince could not see what transpired in the apartment. Later, defendant, who was handcuffed, came out of the apartment with the police.

¶ 8 On cross-examination, Prince testified that defendant had lived in the residence for a few months and had always had the dog. Defendant did not threaten her with the knife or dog. The

initial officers that spoke to defendant were on the sidewalk, and defendant was on the porch. Prince acknowledged speaking with defense counsel several days before trial. She further acknowledged that she told him the only threat she heard defendant state was that if the police entered the gate, he would sic the dog on them. The police did not enter the gate until defendant entered his apartment. Prince acknowledged telling defense counsel that the vestibule door and defendant's front door were broken after police left the building but did not recall stating that defendant had been tased immediately when the police entered his apartment.

¶ 9 Prince signed a document of notes that defense counsel had written while they were speaking. She was given the opportunity to correct anything written on the document but did not do so because she did not recall "the exact sequence of everything" on the day they spoke as it was five years after the incident. Later that day, after reviewing an email from an assistant state's attorney (ASA) that contained what she had told police, her "memory started coming back."

¶ 10 On redirect, Prince testified that she gave a statement to an ASA and Detective Demetrius Kolliopoulos the morning following the incident.[1] The statement reflected that Prince heard defendant repeatedly yelling, "[F]*** the police," that he was going to sic the dog on the officers, and that defendant was going to "kill" them and would stab them if they "c[a]me in here."

¶ 11 Chicago police officer Daniel Frausto testified he was working with his partner Officer Alfredo Pacheco on the evening of February 23, 2014. Both officers were in full Chicago Police Department uniform and driving a marked vehicle. Around 9:15 p.m. they were called to a disturbance on the 600 block of North Christiana. Frausto spoke with Prince on the scene, approximately two addresses south of where the disturbance occurred. Following that

---

[1]Detective Kolliopoulos' last name is alternately spelled "Kolliopolous" throughout the record.

conversation, Frausto and Pacheco went to the location of the disturbance and observed defendant holding a "two feet long, silver machete-style knife at the top of the stairs on the front porch holding a dog between his legs." Defendant was holding the dog by the collar and leash, and the dog was barking at the officers.

¶ 12   Frausto asked defendant to place the weapon down and secure his dog, and defendant responded that he would not put "s***" away, and "threatened to release his killer dog at [Frausto] while he was holding his knife and pointing it" at the officers. Frausto "extended his right arm out in front of his body" as he was testifying to demonstrate how defendant held the machete. Defendant's voice was raised and angry. At the same time, the dog was barking and "pulling" toward Frausto. Frausto continued to ask defendant to put the knife down and secure the dog, but defendant refused to comply and reiterated that he would "release his killer dog at [Frausto]." While they were having this conversation, Frausto had entered the "fence line" of the property and was at the bottom of the steps, while defendant was at the top," approximately 8 to 10 feet away.

¶ 13   When defendant refused to comply, Frausto walked out of the gate and stood outside to request backup from his sergeant and an officer with a taser. At some point, Gunter exited her apartment on the first floor and tried to convince defendant to give her the knife. Defendant moved his arm around to prevent Gunter from getting the knife. Frausto did not recall whether Gunter got the knife from defendant.

¶ 14   Eventually, Sergeant Mahaffey and Officers Michael Tews and Brian Leahy arrived on the scene with a taser. Mahaffey also attempted to speak with defendant about putting down the knife and securing his dog, but defendant again responded he would release his killer dog and kill anyone who "stepped on" his property. Defendant thereafter entered his residence with the dog.

¶ 15    Gunter offered to escort Officers Tews, Leahy, and Pacheco through the second-floor apartment down to the back door of her apartment with defendant. Frausto remained on the front steps with Mahaffey where he could see into the apartment. He could hear defendant, who was inside approximately 10 to 15 feet away, say he would kill anyone who entered his residence. Frausto observed an elderly couple also inside and watched Tews, Leahy, and Pachecho enter the residence. Defendant was still holding the dog in the living room. After the other officers had tasered defendant, Frausto "pushed" his way through the front door to assist with handcuffing defendant, who was then arrested.

¶ 16    Frausto identified the machete and testified defendant was holding it in a menacing manner and pointing at both him and Pacheco. Frausto additionally identified photographs of the apartment building and specified that he was initially inside the gate between the first step and the property line.

¶ 17    On cross-examination, Frausto testified he wrote the original case incident report and arrest report. The case incident report contained a summary of the incident and stated defendant was wielding in one hand a two-foot-long machete-style knife and a barking German Shepard in the other. Frausto acknowledged that neither the case incident report nor the arrest report stated defendant was swinging or waving the knife "wildly towards a Chicago police officer." The reports also did not state that defendant prevented Gunter from taking the knife from him.

¶ 18    Officer Alfredo Pacheco testified to substantially the same version of events as Frausto. When they arrived at the scene, Pachecho and Frausto entered the gate to defendant's building and were at the bottom of the stairs. Defendant was "enraged, yelling" that he was going to kill the police if anyone went onto his property. The officers asked him numerous times to secure the dog

and the machete he was holding. Defendant refused to comply and became angrier. He said he would sic the "killer German Shepard" on them, which made Pacheco scared. The dog was barking the entire time. Defendant stated he was going to hurt and kill the officers and was pointing the machete as he was saying those words. He also "would point to [the officers] directly in an engaging manner." Pacheco imitated the motions defendant made by bending and extending his right arm.

¶ 19    At some point Gunter came outside and took the machete inside the residence. Other officers arrived on the scene, and defendant still refused to comply with police orders. When Sergeant Mahaffey was speaking, defendant continued to make the same statements that he was going to kill the police and sic his dog on them. Defendant then entered his residence, and Pacheco could see him through the window. Gunter used her keys to let Pacheco, Tews, and Leahy inside the back door of the residence.

¶ 20    Once inside, Tews ordered defendant to lay on the ground and secure the dog. Defendant repeated that he would sic the dog on the officers. At the same time, Tews deployed his taser, which hit both defendant and his dog. Defendant continued to resist but was subsequently arrested. Pacheco recovered the machete from the residence and later inventoried it.

¶ 21    On cross-examination, Pacheco testified both he and Frausto entered the gate of the property when they initially arrived at the scene. When Pacheco was inside the residence with Officers Tews and Leahy, defendant had told the dog "sick [*sic*] them" and pushed his dog "to launch" it at them. Following the incident, Pacheco spoke with Detective Kolliopoulos on February 24, 2014. When asked whether he told Kolliopoulos that the officers were behind the gate when speaking with defendant, Pacheco responded, "At times, we gave ourselves distance." He then

agreed he said they were outside the fence and did not remember telling Kolliopoulos that they spoke with defendant inside the fence.

¶ 22    Sergeant Michael Tews testified he and Leahy responded to a call for assistance on the night in question. They were in civilian dress with bulletproof vests marked with "police" on them. They spoke with the officers on the scene and learned defendant had threatened the officers with a dog and a machete. Gunter then took them to the back entrance to the residence. Upon entering the residence, Tews observed defendant in the front room near the window yelling "verbal threats" at the police outside on the porch. He did not see defendant with the machete. The officers told defendant to get on the ground. The dog was lunging at the officers and defendant ordered the dog to sic Tews, causing the dog to lift his front paws off the ground. At that point, Tews deployed his taser. As Leahy attempted to handcuff defendant, he resisted, so Tews tased him again. The officers then arrested defendant. Tews denied that any officer played with the dog inside the residence.

¶ 23    Kissandra Gunter testified for the defense that she was married to defendant in February 2014, and they lived on Christiana. Gunter came outside while defendant and Prince were arguing about her entering the gate and being afraid of the dog. The dog belonged to Gunter and was not aggressive. Defendant had a machete with him, but he did not waive it in an aggressive manner or point it toward Prince or anyone else. When the police arrived, they "stood outside the gate" and instructed defendant to put the dog away. Gunter was outside the entire time defendant was interacting with the officers and did not hear defendant threaten them. She denied that defendant stated he was going to kill the police or sic the dog on them. The dog did not know the command " 'sic[] him.' " At some point, Gunter took the machete from defendant. He did not try to prevent her from taking it. She put the knife behind the radiator in their apartment.

¶ 24    Gunter acknowledged defendant was arguing with the police because he did not understand why he had to secure the dog. She denied letting the police into their residence and stated some of them kicked down the vestibule door and her front door. She did not see the officers tase defendant, but they eventually said they were taking defendant, who was intoxicated, to jail to sober up.

¶ 25    The following morning, Gunter found defendant's phone on the floor in the front room of their apartment and gave it to Detective Kolliopoulos. The phone "had a video of what was happening." The video did not show anything visually, but it contained audio of what had occurred, and she gave it to the detective to "show that [defendant] wasn't threatening the police." Gunter could not remember what she heard on the recording. She unlocked the phone for the detective and did not see it again.

¶ 26    On cross-examination, Gunter denied that the dog was being aggressive and stated, "I don't think she barked." She could not remember if the back door had been broken by police and reiterated that she did not let them in the back door.

¶ 27    Defendant testified that on the day of the incident, he had purchased the machete and liquor. Around 8:30 p.m., he arrived home and was sitting on the porch with his dog. He saw Prince around 9 p.m. In the past, he had seen Prince walk past the dog to get into the property. That night, Prince asked defendant to put the dog away. Defendant told her that she had walked past the dog many times and to "just come right in." Gunter came outside at one point. Defendant observed police arrive. He had been arguing with Prince for about 10 minutes by then.

¶ 28    Once the police arrived, they stood outside the closed gate and asked defendant to put the dog away. Defendant acknowledged that he argued with them. He gave the machete to Gunter, and she went inside the apartment. Defendant further acknowledged that the dog was barking, but

he denied that the dog lunged at anyone. The dog was sitting on the porch with him, and he was not holding onto its collar. After approximately 10 minutes, defendant went inside his apartment with the dog and locked the door. While inside, defendant saw some officers running up the steps to the front door. He was recording with his phone because the officers were running aggressively toward his home. The officers forced their way through both the vestibule door and his front door. He was standing looking out the front window when they tased him.

¶ 29    Defendant was eventually transported to the police station and signed a consent to search form for his phone. A detective showed defendant his phone, and defendant supplied his passcode. He was not given paperwork that informed him how he could collect his phone. The police only informed him that it was evidence. The detective left the room with the phone and did not play the audio for defendant.

¶ 30    Defendant denied threatening the officers with the machete. He did not wave or point it at the officers on his porch or inside his apartment. He further denied threatening them with the dog and did not tell the dog to " 'sic[] them.' "

¶ 31    On cross-examination, defendant testified he did not know Prince was afraid of the dog or him. He was intoxicated by the time he saw Prince that night. The machete was on the chair behind him, and he denied having it in his hand when Prince came home and asked him to put the dog away. Defendant acknowledged that Gunter took the knife from him later. He picked up the machete when he saw the police drive the wrong way up his street. The car was unmarked, but he knew it was the police. Defendant gave the knife to Gunter because he did not "know how officers of the Chicago Police would take to a black man on a porch with a two-foot-long knife." He did not grab the dog until the police told him they were going to come into his yard.

¶ 32    Defendant acknowledged he was agitated from his fight with Prince and was not listening to the police officers. He was yelling and the dog was barking. The officers asked him "[p]robably, like, three times" to put the dog away and he did not comply. He did not start recording until he was inside the house, so the recording did not capture anything that occurred while he was on the porch. Defendant denied saying anything to police while he was inside the apartment. The officers entered the house and tased him immediately; they did not tell him to get on the ground.

¶ 33    Detective Demetrius Kolliopoulos testified he was assigned to the instant case and spoke with various officers about the incident. Officer Pacheco informed him that he and Frausto spoke with defendant from behind a wrought-iron fence enclosing the property. Kolliopoulos wrote a supplemental report in this case, which stated the officers spoke to defendant "while they were at the fence in between them, I guess." The report did not state that the officers spoke to defendant from inside the fence.

¶ 34    On cross-examination, Kolliopoulos testified that on February 24, 2014, he spoke with Gunter with an ASA present at her residence. Gunter gave him defendant's cellphone because she believed there was a recording of the incident from the night before. Gunter unlocked the phone for him, and Kolliopoulos looked through the phone for videos or photos taken of the incident. Gunter and the ASA sat at a table with him while he looked through the phone. However, Kolliopoulos did not locate any recording that captured the incident. He then took the phone to defendant so they could go through the phone together to confirm there was nothing of evidentiary value on it.

¶ 35    At the police station, Kolliopoulos met with defendant, who told him he did not take any photos or videos. Nevertheless, he asked defendant to unlock the phone so they could look through

it together. Kolliopoulos still did not find any relevant recordings on the phone. He then inventoried the phone as prisoner's property, which he explained meant it belonged to a prisoner and had no evidentiary value. The property is inventoried because prisoners cannot have property while being processed and they are given a receipt with instructions to retrieve it later. Kolliopoulos learned that the cell phone had since been destroyed by CPD.

¶ 36    On redirect, Kolliopoulos acknowledged he did not read or give defendant or Gunter the notice to property owner about retrieving the phone. In inventorying the phone, he followed CPD procedures for prisoner property.

¶ 37    Following arguments, the jury found defendant guilty of two counts of aggravated assault of Officers Frausto and Pacheco. The court subsequently denied defendant's posttrial motion and sentenced defendant to two concurrent two-year sentences. Defendant timely appealed.

¶ 38    On appeal, defendant contends the State failed to prove beyond a reasonable doubt that his conduct placed Officers Frausto and Pacheco in a reasonable apprehension of receiving an imminent battery.

¶ 39    On a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison,* 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43), and we do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or

unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens,* 237 Ill. 2d 311, 334 (2010).

¶ 40 As charged here, an assault occurs when an individual "without lawful authority, *** knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1(a) (West 2014). The offense becomes elevated to aggravated assault when, in committing an assault, the individual knows the person assaulted to be a peace officer performing his official duties. 720 ILCS 5/12-2(b)(4)(i) (West 2014). Defendant does not dispute that he knew Frausto and Pacheco were police officers performing their duties. Rather, he contends only that the evidence failed to show his actions put them in reasonable apprehension of receiving an imminent battery.

¶ 41 Whether an assault victim was reasonably apprehensive is a question of fact. See *People v. Enerson*, 202 Ill. App. 3d 748, 749 (1990). A victim's apprehension can be established inferentially based on the conduct of the defendant and the victim. *Id.* at 749-50. In Illinois, " 'words alone are not usually enough to constitute an assault. Some action or condition must accompany those words before there is a violation of the statute.' " (Internal citations omitted.) *People v. Taylor*, 2015 IL App (1st) 131290, ¶ 15 (quoting *People v. Floyd*, 278 Ill. App. 3d 568, 570-71 (1996)). Moreover, a victim's apprehension must be of an immediate or imminent battery, not of an indeterminate future harm. *People v. Vanhoose*, 2020 IL App (5th) 170247, ¶ 26.

¶ 42 Here, we find the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of aggravated assault, and specifically, that a rational trier of fact could find the officers were in reasonable apprehension of receiving an immediate or imminent battery. The evidence showed defendant engaged in a verbal argument with Prince and was holding a machete and his

barking German Shepard dog. After defendant refused to put the dog away so Prince could pass, she called the police. When Officers Frausto and Pacheco arrived on the scene, after speaking with Prince, they approached defendant's building and asked him to put down the two-foot machete he was holding and secure his barking dog. Both Pacheco and Frausto testified they were inside the gate while this took place and at the bottom of a staircase, while defendant was 8 to 10 feet above them at the top of the stairs. Defendant pointed the machete at the officers as he threatened to hurt and kill them. He repeatedly threatened that he would release his dog on them while wielding the machete. Both officers demonstrated for the jury how defendant was wielding the machete by extending and bending their arms.

¶ 43    Defendant refused the officers' numerous requests to put down the knife or secure the dog. Eventually, because defendant refused to comply, the officers had to step outside the gate to call for assistance. Although defendant was at the top of the stairs, we find that the length of the machete, the short distance between him and the officers, and his repeated movement of pointing the machete at them as he threatened to kill them were sufficient to enable a rational trier of fact to find that the officers were in reasonable apprehension of receiving an immediate battery from defendant. See *Taylor*, 2015 IL App (1st) 131290, ¶ 15 (words alone are insufficient to sustain an assault conviction and must be paired with some action).

¶ 44    Defendant argues that the officers' testimony that they spoke with him inside the fence was contradicted by his own testimony, Gunter's testimony, and Detective Kolliopoulos' testimony that the officers spoke with defendant outside the fence and defendant threatened to kill the officers only if they came onto his property. According to defendant, this inconsistency demonstrates that the officers were not in reasonable apprehension of receiving an immediate battery because they

were not close enough for defendant to use the machete against them and his statement was akin to a future threat rather than an immediate one. However, the record shows the jury was presented with the differing versions of events, including whether the officers spoke to defendant inside the fence or outside the fence. As the triers of fact, it was up to the jury to resolve this inconsistency and assess the credibility of the witnesses in making their determination of guilt. *Siguenza-Brito*, 235 Ill. 2d at 228 (It is within the province of the trier of fact "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence.").

¶ 45 Moreover, the jury was not required to accept defendant's version of events or "seek out all possible explanations consistent with a defendant's innocence and elevate them to reasonable doubt." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 11. While defendant claims his threats were for a future, rather than an immediate harm, this claim is belied by the testimony that he was pointing the machete at the officers at the time of the incident. Defendant's agitated state, his refusal to comply with police commands, and his pointing a two-foot machete at the officers shows that the threatened harm was immediate or imminent, rather than a future harm. Further, although defendant is correct that Kolliopoulos testified Pacheco told him they spoke with defendant outside the fence, we do not find this inconsistency renders the evidence "so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Givens,* 237 Ill. 2d at 334.

¶ 46 For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 47 Affirmed.