2022 IL App (2d) 210505-U
No. 2-21-0505
Order filed July 6, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) ) | Nos. 18-CF-1228 18-CM-1698 |
| | ) | |
| PETER A. SOVA, | ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*: There was sufficient evidence that defendant committed residential burglary. Five eyewitnesses testified that, once they apprehended defendant after he was found in the home, he confessed that he entered the home to get money. The trial court reasonably rejected defendant's argument that the witnesses colluded to fabricate his inculpatory statement. In any event, there was sufficient evidence to convict apart from defendant's reported inculpatory statement.

¶ 2   Defendant, Peter A. Sova, appeals from his conviction, after a bench trial, of residential burglary (720 ILCS 5/19-3(a) (West 2018)). He argues that the testimony of the State's five occurrence witnesses was unreliable. Those witnesses—the residence's owners and three of their

guests—testified that, when the group apprehended defendant, he confessed that he was in the house to get money. Defendant contends that none of the five witnesses reported his admission of intent in entering the house until after they learned he was charged only with criminal trespass to a residence (720 ILCS 5/19-4 (West 2018)), a lesser charge than residential burglary. He implies that the witnesses necessarily colluded to fabricate his inculpatory statement because they were unhappy with the charge. He therefore contends that the evidence failed to show that he entered the residence with the intent to commit a theft, and he asks us to reduce his conviction to criminal trespass to a residence. We hold that the possibility of collusion between the occurrence witnesses was an issue of credibility for the trier of fact. Consequently, the evidence, viewed in the light most favorable to the State, supports defendant's residential-burglary conviction. We thus affirm.

¶ 3                                    I. BACKGROUND

¶ 4     A grand jury indicted defendant on one felony count and four misdemeanor counts stemming from an incident in which he pushed his way into a residence and was tackled by some of the people present. The felony charge was residential burglary and alleged that defendant, "without authority, knowingly entered into the dwelling place of Timothy Stiff, *** with the intent to commit therein a theft." The four misdemeanor counts charged battery (720 ILCS 5/12-3(a) (West 2018)) to two victims, Timothy Stiff and Lee Stiff. The record indicates that defendant was also charged in case No. 18-CM-1698 with criminal trespass to a residence, but that charging instrument is not part of the record on appeal.

¶ 5     At defendant's bench trial, Timothy testified that he lived with his wife, Lee, and their two children in their house in Algonquin. On Saturday, December 14, 2018, he and Lee were hosting a Christmas party, which five other couples attended. They had a large catered dinner. Alcoholic drinks were available before, during, and after the meal, and Timothy drank beer before and after

the meal. Two of the Stiffs' cars were in the garage and at least two vehicles were parked in the driveway.

¶ 6      In the early morning hours of December 15, 2018, Timothy, Lee, and the remaining guests—three couples—were in the basement of the house. Timothy ran up from the basement to get some antacids for a guest. At the top of the basement stairs, he noticed a hand on top of the mudroom door across the hallway. The hand was closing the door, which swings into the mudroom. Timothy believed that someone was hiding behind the door. After momentarily freezing, Timothy called out, asking who was there. The second time Timothy called out, the intruder said that he was "Sam's friend" and that he thought that he had come to the wrong house. Timothy responded that he did not know anyone named Sam and that the intruder was definitely in the wrong house. Timothy started pushing the mudroom door open, but the intruder pushed back. Timothy then pulled the door shut and shouted for assistance.

¶ 7      The intruder responded by forcefully pulling open the door, which caused Timothy to lose his grip. As the door opened, Timothy saw the intruder. He was taller than Timothy, who was six feet two inches. The intruder was wearing "a ski mask, sunglasses, a bandana over his mouth, and had gloves on his hands." The intruder came into the hallway and headed toward the door into the garage (Timothy later learned that one of the couples had left the overhead garage door open when they left, and Timothy assumed that the intruder entered through that open door.) Timothy grappled with the intruder, trying to keep him from leaving, but the intruder managed to get through the door into the garage. As Timothy tried to restrain the intruder, he looked down and saw Lee holding on to one of the intruder's feet. He told her to leave and said, "I got this." Timothy wrestled the intruder to the ground. Some of Timothy's guests entered the garage and helped him. As they restrained the intruder, Timothy heard someone mention calling the police. The intruder

then said, " '[D]on't call the police; I have a six-year-old daughter; I wasn't here to hurt anyone; I was just here for money.' " As a result of the struggle, there were scratches on Timothy's arms and scratches on the paint in the hallway.

¶ 8    A police officer arrived shortly after the group restrained the intruder. Someone other than Timothy uncovered the intruder's face. Timothy identified defendant in court as the intruder.

¶ 9    Timothy testified that, on the night of the incident, he gave a police officer an oral account of what happened. The officer then asked for a "brief" written statement and gave Timothy a single sheet of paper. In about five lines, Timothy wrote what had happened. Asked if he wrote in this statement that defendant said he entered the house to get money, Timothy replied, "I don't know. I mean, I don't think so." The next week, Timothy followed up with the police about the status of the case:

> "I sent an email to the police on Monday to see what happened. You know, again, I thought this was pretty open and shut. The guy was in our house wearing a mask. And I sent an email saying just curious what happened, you know, on Friday night."

Timothy learned that defendant "was released without any—you know, a misdemeanor trespassing." Afterward, the police reopened the investigation and asked Timothy for "a second[,] more thorough written report." Timothy wrote a more detailed statement several days after he wrote the initial one.

¶ 10    On cross-examination, when asked what kind of ski mask defendant was wearing, Timothy was not sure if it had one eyehole or two. He noted that "no part of [defendant's] face was visible." Finally, when asked if "it was a ski mask with a bandana over it," Timothy replied, "Well, bandana over the mouth, sunglasses over the eyes." Timothy testified that he drank beer and bourbon at the gathering but was not intoxicated. He was unaware of anything being taken from the house,

the garage, or any car in the driveway.

¶ 11     Lee testified that, sometime after midnight on December 15, 2018, she was with her guests in the basement of her house.  She saw Timothy go upstairs to find an antacid for a guest.  She heard from upstairs something that sounded like yelling, and then she heard Timothy say that he needed help.  When she came upstairs, she saw Timothy and an unknown person grappling in the hallway.  The intruder was in dark clothing.  He was wearing a ski mask, a bandanna over his mouth, and sunglasses over the eyeholes of the ski mask.  As they struggled, Timothy and the intruder ended up in the garage.  Lee grabbed the intruder's legs.  He dragged her across the garage floor as he struggled to escape, kicking her hand in the process.  Timothy asked her to leave to check on the children; she let go when other guests arrived to help.  One of the guests called the police.  Lee later saw the intruder with his face uncovered; she identified defendant in court as the intruder.  Lee confirmed that, on the night of the incident, there were two vehicles parked in the garage, two in the driveway, and one on the street.

¶ 12     On cross-examination, Lee testified that she had consumed several beers at the gathering.  She stated that, when defendant's sunglasses were removed, she saw that he was wearing a ski mask with eyeholes.  She also testified that, as defendant was being restrained, he said he was in the house to get money, and she related this to the police at the scene:

> "Q. Okay.  And when you were outside, were you in the area where your husband was restraining this person?
>
> A. Yes.
>
> Q. Okay.  Was he continuing to struggle at that point in time?
>
> A. A little bit.
>
> Q. Okay.  In what way?

A. He just asked and said he wasn't there to hurt anyone and just let him go. He was there just looking for money.

Q. Okay. Did you tell the police that you heard him make that statement when they were investigating this incident?

A. I did.

Q. Okay. That night?

A. That night."

Elaborating, Lee testified that the police were at her house for at least an hour, during which time she told them "everything that had occurred that [she] remembered," including that defendant made "that statement." The police did not ask her to give a written statement on the night of the incident. Four days later, she went to the police department and gave a written statement providing "all of the details as [she] recalled them from that evening." She did not include in that statement that she heard defendant say he was in the house for money.

¶ 13    Lee testified that she did not notice anything missing from the house after the incident; the only damage she noticed was a scuff mark on the side of her car, which she assumed was a result of the struggle.

¶ 14    Craig Koop, one of the party guests, testified that he was at the Stiffs' house from about 7 p.m. on December 14, 2018, until after midnight on December 15, 2018. The party was held in the finished basement of the house. At some point after midnight, he saw Timothy go upstairs to get an antacid for another guest. Someone commented on a noise upstairs, and Lee started up the stairs with Koop following. When Koop reached the top of the stairs, Lee was yelling at someone, ordering that person to leave the house. At first, Koop could not see exactly what was happening, but, when his view became unobstructed, he saw Timothy on the steps down into the garage,

grappling with a large man. Koop got ahead of Lee and tried to help Timothy. Eventually he and Timothy forced the intruder to the ground. Koop pinned the intruder by getting astride him. Timothy put his foot on the intruder. Koop thought that another guest, Joseph Ozzauto, was on the intruder's legs. Matthew Stevens, also a guest, pinned him from the front. Stevens took sunglasses or a flashlight from the intruder's hand. The intruder was wearing a ski mask with eyeholes, a long-sleeved shirt, and jeans. During the struggle, the intruder's mask came up and Koop could see that he was bearded.

¶ 15    Koop told the intruder to stop struggling until the police arrived. When Koop mentioned the police, defendant said:

> " 'Don't do this. You don't need to call the police. I have a daughter. I have a six-year-old daughter. I wasn't going to hurt anyone. I was just looking for money. Don't do this.' "

¶ 16    The police arrived quickly. Koop made oral reports to "probably three" officers. The officers told him that, because Timothy's written report was sufficient, he did not need to make a written report. He made a written statement later when contacted by detectives.

¶ 17    Stevens' testimony was largely consistent with that of the previous witnesses. He said that everyone in the basement ran upstairs when they heard Timothy calling for help. Lee was the first one up the stairs. When Stevens got upstairs, Timothy and Koop were wrestling with the intruder. He tried to help. Timothy pinned defendant's lower legs while Koop pinned his upper body. Stevens grabbed his left hand and pried loose a small flashlight. He described the intruder as wearing a bandanna over his face that came loose during the struggle.

¶ 18    Stevens' description of defendant's plea to be let go largely matched that of the other witnesses:

"And we said we are calling the police. And then he asked us not to call the police, to let him go, and we said we are not letting you go. And he said he had a daughter, and he was just looking for some money and if we could just let him go. And we said that's just not happening."

Stevens did not give a written statement that night. However, after the group discovered that defendant "pretty much walked," they called to find out what was happening, "and the investigation ended up getting reopened again." Stevens then provided a written statement to detectives.

¶ 19    On cross-examination, Stevens testified that he drank at the gathering but was not intoxicated. He agreed that all four couples together spoke to Officer Michael Seegers inside the house. They "explained everything in detail to him." Seegers might also have interviewed Timothy individually. Stevens agreed that he later followed up with the police because he believed that the original charge against defendant was not serious enough.

¶ 20    Ozzauto's testimony largely corroborated that of the first four witnesses. He was in the basement when he heard Timothy screaming. He ran upstairs and, looking down the hallway, saw "bodies flying over a car in the garage." He ran into the garage and saw that Timothy and Koop had someone pinned, so he grabbed that person's legs. The intruder was wearing a black mask, sunglasses, "something around his mouth," and gloves. Ozzauto saw Stevens pry a flashlight out of the intruder's hand. When the intruder was restrained,

"[Koop] had asked him what are you doing, and he said 'I'm looking for cash.' And then we said, 'well, you are going to be here until the police come.' And he's like 'I have a daughter, don't call the police.' "

Ozzauto spoke to the police that night but, like all the witnesses except Timothy, did not provide

a written statement until several days later.

¶ 21   On cross-examination, Ozzauto testified that he consumed alcohol at the gathering but did not become intoxicated. He stated that, after the incident, he and the rest of the group together spoke with Officer Seegers for about an hour after the incident.

¶ 22   Amanda Olsta, an officer with the Algonquin police, testified that, at about 12:30 a.m. on December 15, 2018, she was dispatched to the Stiffs' house. When she arrived, she found defendant lying on the driveway restrained by two people. When she approached defendant to handcuff him, she smelled alcohol. However, he did not seem intoxicated to the point of being confused or uncoordinated.

¶ 23   On cross-examination, Olsta said that, when she arrived, defendant's head was bare and he had a black bandanna around his neck. There was a "stocking cap style type hat" on the ground near him. The people present started to tell her what had happened, but they were "amped up"—shouting and using profanity. Thus, she wanted to remove defendant from the scene as quickly as possible to calm the situation. When Officer Seegers arrived, she consulted with him. Later, she went back inside the home and spoke with some of the women present. She noticed an odor of alcohol from at least some of them. She felt that it was difficult to get information from them because she was being "talked at" rather than conversing.

¶ 24   Seegers testified that when, arrived at the Stiffs' house, he interviewed the Stiffs and their guests both individually and as a group. He was at the house for approximately 90 minutes. Everyone in the group appeared to be mildly intoxicated. No one told him that the intruder had said that he entered the home looking for money. About three days later, Seegers learned that the Stiffs and their guests were unhappy that the charge against defendant was criminal trespass to a residence. He also learned that the investigation had been reopened, but he had no role in that

decision.

¶ 25     Seegers interviewed defendant at the Algonquin police department in the early hours of December 15, 2018, within two hours of Seegers' arrival at the Stiffs' house. After signing a *Miranda* waiver, defendant told Seegers that he had been walking from a friend's home in Huntley to his home in Lake in the Hills. He stopped in the vicinity of the Stiffs' house to look for "Sam's" house because he wanted to get a beer for the remaining walk home. He was not able to give specific information about his friend in Huntley or about "Sam." Defendant appeared to be somewhat intoxicated but not disoriented or incoherent.

¶ 26     The State rested at the conclusion of Seegers' testimony. Defendant presented no evidence.

¶ 27     The trial court found defendant guilty of residential burglary and criminal trespass to a residence. It found him not guilty of battery on the basis that defendant was privileged to use reasonable force to resist the attempts to restrain him.

¶ 28     The trial court found all the State's witnesses credible. The court rejected defendant's implication in closing argument that the five occurrence witnesses had conspired to fabricate a story that would lead to more severe charges for defendant. The court found that the witnesses had far more to lose than to gain by testifying falsely under oath. The court also noted that the witnesses would not have known that defendant had a six-year-old daughter[1] and would not have risked fabricating such an easily verifiable statement. The court further commented that "all of the party attendees who testified identified that [defendant] was wearing sunglasses." This testimony, the court found, supported the reasonable inference that defendant had concealed his

---

[1]Defense counsel represented at defendant's July 2021 sentencing hearing that defendant had a nine-year-old daughter, but no evidence of the daughter's existence was presented at trial.

identity and entered the home to commit a theft.

¶ 29    Defendant filed a posttrial motion, asserting that the State's evidence was insufficient. The court denied the motion, summarizing its original reasoning as follows:

> "The Court balanced [all the] testimony and found then and finds now that the testimony of the lay witnesses, the Stiffs and their social acquaintances who were present, [was] credible, and believe[d] then and believes now based upon the whole of the evidence that the version that was relayed by those individuals that did embody certain inconsistencies or certain discrepancies in terms of what one person said versus the other, on whole, still was credible.
>
>    The *** Court also concurs with the State that those statements, plus the conduct of the defendant as it was communicated to the Court[,] is indicative of the fact that [defendant] was engaged in the act of attempting to commit theft inside the Stiffs' home."

The court found that the criminal-trespass conviction merged with the residential-burglary conviction. The court sentenced defendant to four years' imprisonment. Defendant timely appealed.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, defendant argues that the trial court erred in finding that the State proved, as an element of residential burglary, that defendant entered the Stiffs' house with the intent to commit a theft therein. See 720 ILCS 5/19-3(a) (West 2018) ("A person commits residential burglary when he or she knowingly and without authority enters or knowingly and without authority remains within the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft."). He summarizes his contentions as follows:

"[T]he State's evidence failed to establish that [he] entered the residence of [Timothy and Lee] with the intent to commit a theft, an essential element of the offense. None of the State's occurrence witnesses initially told police that [defendant] stated he was at the house looking for money, and they told police of the statements only after later complaining that [he] was charged only with trespass. Further, no physical evidence was presented and police witnesses failed to corroborate the witnesses' testimony that [he] was wearing a ski mask and sunglasses when he was inside the house."

Defendant contends that it "simply is not plausible that the witnesses would have omitted [his] purported statements in their initial detailed descriptions of the incident to police." "It is inconceivable that none of these five witnesses, all of whom acknowledged speaking with police on the night of the incident, would not have told Officer Seegers about [defendant's] purported statements."

¶ 32    Defendant implies that the witnesses' testimony about his inculpatory statement was the result of collusion between the witnesses to get him charged with burglary:

"There is a simple and plausible explanation for the late addition of the witnesses' attribution of purported incriminating statements to the defendant. A few days after [defendant's] arrest, the Stiffs learned [that he] had been charged only with misdemeanor trespassing, and the investigation was reopened by police. [Stevens] said the witnesses believed the defendant 'pretty much walked that night' and was not charged with a serious enough offense. [Timothy] testified he sent an email to police to see what happened with the case and learned [that defendant] had been charged with a misdemeanor and released. 'I thought this was pretty open and shut. The guy was in our house wearing a mask.' Only [Timothy] made a written statement on the night of the incident. But after police reopened

the investigation, each of the five testifying witnesses provided written statements to police, including a second statement by [Timothy]."

Moreover:

> "It is crucial to note the significance of the evidence of [defendant's] purported statements in the context of the charges in this case. [He] initially was charged only with misdemeanor criminal trespass to a residence. A person commits criminal trespass to a residence when, without authority, he knowingly enters or remains within any residence. [Citation.] The offense of criminal trespass to residence is lesser-included offense of residential burglary. [Citation.] The intent to commit a theft is the essential element that raised the offense of criminal trespass to residence into the offense of residential burglary. Thus, the evidence of [defendant's] purported statements—not disclosed to police on the night of the incident but presented after the investigation was reopened and at trial—was critical to the prosecution and conviction of [defendant] for the more serious offense of residential burglary."

¶ 33 The State responds that defendant is asking this court to reweigh the credibility of the witnesses, which we should not do.

¶ 34 Defendant replies that, although it is the province of the trial court to judge witness credibility, "a conviction based on improbable or unconvincing testimony requires reversal."

¶ 35 We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "

(Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

"Under [the standard of *Jackson* and *Collins*], the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. [Citation.] But merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision. A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of [the] defendant's guilt. [Citation.]" *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

Further:

"Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt. [Citation.] Under this standard, the eyewitness testimony may be found insufficient 'only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.' [Citation.] A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *People v. Gray*, 2017 IL 120958, ¶ 36.

¶ 36    Initially, we address the existence of the supposed "simple and plausible explanation for the late addition of the witnesses' attribution of purported incriminating statements to the defendant"—namely, collusion among the occurrence witnesses. Viewing the evidence in the light

most favorable to the prosecution, we cannot say that the trial court was unreasonable in rejecting the defense's theory.

¶ 37    Defendant argues that the failure of the occurrence witnesses to inform the police on December 15, 2018, of defendant's inculpatory comment is so discrediting that any reasonable fact finder must infer that the witnesses' testimony was the product of later fabrication. We disagree.

¶ 38    First, we cannot take it as a given that none of the witnesses reported defendant's inculpatory comment when the police interviewed them on December 15, 2018. Seegers testified that no one present reported such a comment, and only Lee testified that she did. Seegers was not *necessarily* correct. Police officers are expected to pay attention and not overlook significant statements by witnesses. However, the group Seegers was trying to interview was large and—in his and Olsta's descriptions—slightly intoxicated and "amped up." Under these conditions, Seegers may not have heard all remarks. Moreover, if the other witnesses heard Lee report to Seegers defendant's inculpatory comment, they might have thought that repeating it was necessary.

¶ 39    Second, we are not persuaded that a complete failure by the witnesses to report the comment on December 15, 2018, would necessarily imply a later fabrication. Defendant contends that "[i]t is inconceivable that none of these five witnesses, all of whom acknowledged speaking with police on the night of the incident, would not have told Officer Seegers about [his] purported statements," had they heard them. But the witnesses' encounter with defendant was extremely physical and occurred while they were mildly intoxicated. Their initial reports might naturally have focused on the physical aspects of the encounter, leaving defendant's comment inadvertently unmentioned.

¶ 40    Moreover, the trial court drew a reasonable conclusion from the witnesses' references to defendant's statement about having a six-year-old daughter. The court found it implausible that the witnesses would ascertain that defendant had a daughter of that age and or would fabricate something so easily verifiable. To be sure, a particularly devious person bent on making sure defendant faced a more serious charge might ascertain that he had a daughter who was approximately six years old and exploit that fact for believability. Or such a person might simply proceed on the supposition that a burglar who would invent a friend "Sam" might also invent a six-year-old daughter. However, as the court noted, the witnesses surely would have realized that lying under oath risked criminal consequences far outweighing any potential reward. In the end, defendant's theory of collusion is far-fetched. Accordingly, the trial court could reasonably find that defendant did tell the witnesses he had entered the home to get money yet that the police did not make a record of that inculpatory statement when it was relayed by the witnesses at the scene on December 15, 2018.

¶ 41    Of course, it is likely that the five witnesses talked among themselves so that their recollections were not entirely independent of one another's. Seegers testified that he interviewed the group at the Stiffs' house both individually and as a group, which implies that the group was without an officer present at times on the morning of the December 15, 2018, and could talk among themselves. Further, Timothy and Stevens both testified to following up with the authorities and learning the defendant had received what they deemed to be an unreasonably minor charge. It is thus a fair inference that the witnesses also spoke to one another about the state of the case *after* December 15, 2018. But, to the extent that this talk among the witnesses interfered with their independent recollection of the events, this would simply be an instance of the ordinary fallibility of eyewitness testimony and not deliberate dishonesty. We have concluded that a reasonable trier

of fact was not required to infer that the five witnesses' testimony about defendant's inculpatory statement was a deliberate fabrication. Thus, the trier of fact could accept that portion of the testimony even if it did find that other portions were less reliable. See, *e.g.*, *Gray*, 2017 IL 120958, ¶ 47 ("[T]he fact-finder is charged with deciding 'how flaws in part of the testimony affect the credibility of the whole' [citation].").

¶ 42 In any event, regardless of the witnesses' testimony as to defendant's inculpatory statement, the evidence was sufficient to establish the intent element of residential burglary. Criminal intent, for purposes of residential burglary, "is a state of mind that not only can be inferred from the surrounding circumstances [citation], but usually is so proved." *People v. Maggette*, 195 Ill. 2d 336, 354 (2001). Given that vehicles were parked in the garage and driveway, defendant must have realized that people were probably in the house. But the evidence suggests that defendant entered the house stealthily, not yelling for his supposed friend "Sam." Further, all the witnesses, despite some minor differences in their recollections, agreed that defendant had his face covered when he entered, which strongly suggests a nefarious purpose. These circumstances are sufficient to support the conclusion that defendant entered the house with the intent to commit a theft.

¶ 43                                  III. CONCLUSION

¶ 44 For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 45 Affirmed.